651 F.2d 189
 8 Fed. R. Evid. Serv. 458, 7 Media L. Rep. 1377
 UNITED STATES of America
v.
Gerald M. CUTHBERTSON, et al., CBS Inc., Third-Party
Witness, Appellant, No. 81-1467.
UNITED STATES of America, Respondent,
v.
Gerald M. CUTHBERTSON, et al., Respondents,
CBS Inc., Petitioner, Nos. 81-1470 & 81-1485,
Honorable Herbert J. Stern, Nominal Respondent.
 Nos. 81-1467, 81-1470 and 81-1485.
 United States Court of Appeals,
Third Circuit.
 Argued April 21, 1981.
Decided May 29, 1981.
 
 Timothy B. Dyk (argued), Michael S. Schooler, Duane D. Morse, David Westin, William J. Perlstein, Richard N. Reback, Wilmer, Cutler & Pickering, Washington, D. C., Clyde A. Szuch, Talbott Miller, Pitney, Hardin & Kipp, Morristown, N. J., for petitioner CBS Inc., Ralph E. Goldberg, Allen Shaklan, Richard Altabef, New York City, of counsel.
 Floyd Abrams (argued), Kenneth E. Meister, Carol E. Rinzler, Cahill Gordon & Reindel, New York City, for amici curiae, National Broadcasting Co., Inc., et al.
 John J. Barry (argued), Frohling, Fitzpatrick & Barry, Newark, N. J., for appellees-respondents, Paul L. Gorrin, Gerald M. Cuthbertson, Allan G. Gorrin, John Kelmans, Samuel Bauman & Thomas P. DeVita; Joseph T. Afflitto, Wayne, N. J., Andrew R. Jacobs, Basking Ridge, N. J., William J. Martini, Passaic, N. J., Leonard Meyerson, Jersey City, N. J., John W. Noonan, Newark, N. J., of counsel.
 William W. Robertson, U. S. Atty., Maryanne Trump Desmond, Asst. U. S. Atty., Newark, N. J., for appellee-respondent, United States of America.
 Katharine P. Darrow, Gen. Atty., New York City, Kohn, Savett, Marion & Graf, P. C., Philadelphia, Pa., Debevoise, Plimpton, Lyons & Gates, New York City, for amicus curiae, The New York Times Co.
 Before SEITZ, Chief Judge, and ALDISERT and GIBBONS, Circuit Judges.
 OPINION OF THE COURT
 ALDISERT, Circuit Judge.
 
 
 1
 We are again faced with free press-fair trial issues arising out of the factual situation presented in United States v. Cuthbertson, 630 F.2d 139 (3d Cir. 1980), cert. denied, 449 U.S. 1126, 101 S.Ct. 945, 67 L.Ed.2d 113 (1981) (Cuthbertson I ). Pursuant to our mandate, the Columbia Broadcasting System, Inc., submitted certain material to the district court for in camera examination. We instructed the district court to review the materials and determine if they would have evidentiary value to the defendants in impeaching government witnesses. The major question for decision in this appeal is whether the district court erred in holding that these materials must be turned over to the defendants as exculpatory evidence under the teachings of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). An initial question is whether we have jurisdiction to consider the court's order as a final order, appealable under 28 U.S.C. § 1291, or on a petition for writ of mandamus under the All Writs Act, 28 U.S.C. § 1651. We conclude that we have appellate jurisdiction over the district court's order, and we reverse and remand for further proceedings.
 
 I.
 
 2
 Because the facts are detailed in Cuthbertson I, we need set forth only a synopsis. On December 3, 1978, CBS presented on its news program "60 Minutes" an investigative report describing fast-food franchising by an organization known as Wild Bill's Family Restaurants. The report was based on interviews with a number of persons, including certain franchisees and former employees of Wild Bill's, and local government officials. On September 5, 1979, a federal grand jury returned an indictment against several principals of Wild Bill's charging them with fraud and conspiracy in the operation of the company. On February 4, 1980, on the eve of trial, the defendants served on CBS a subpoena pursuant to rule 17(c) of the Federal Rules of Criminal Procedure demanding production of all reporters' notes, file "out takes," audiotapes, and transcripts of interviews prepared in connection with the "60 Minutes" program. The district court's denial of CBS's motion to quash the subpoena and its subsequent order holding CBS in contempt were before us in the previous appeal.
 
 
 3
 In Cuthbertson I, we held that "journalists possess a qualified privilege not to divulge confidential sources and not to disclose unpublished information in their possession in criminal cases." 630 F.2d at 147. We recognized that "compelled production of a reporter's resource materials can constitute a significant intrusion into the newsgathering and editorial processes." Id. We concluded that this qualified privilege may be superseded by "countervailing interests" in particular cases, requiring the district courts to "balance the defendant's need for the material against the interests underlying the privilege ...." Id. at 148.
 
 
 4
 We also established guidelines for the district courts to use in applying rule 17(c) to subpoenas duces tecum directed to third parties. Rule 17(c) was not intended to be a broad discovery device, and only materials that are "admissible as evidence" are subject to subpoena under the rule. See Bowman Dairy Co. v. United States, 341 U.S. 214, 221, 71 S.Ct. 675, 679, 95 L.Ed. 879 (1951). To obtain pretrial production and inspection of unprivileged materials from a third party witness, a party must show:
 
 
 5
 "(1) that the documents are evidentiary and relevant; (2) that they are not otherwise procurable reasonably in advance of trial by exercise of due diligence; (3) that the party cannot properly prepare for trial without such production and inspection in advance of trial and that the failure to obtain such inspection may tend unreasonably to delay the trial; and (4) that the application is made in good faith and is not intended as a general 'fishing expedition.' "
 
 
 6
 630 F.2d at 145 (quoting United States v. Nixon, 418 U.S. 683, 699-700, 94 S.Ct. 3090, 3103-3104, 41 L.Ed.2d 1039 (1974) (footnote omitted)). Because the district court had ordered in camera review rather than presentation to the moving party, however, we deemed the second and third elements of this test inapplicable. 630 F.2d at 145.
 
 
 7
 Defendants had requested previous statements by persons whose names did not appear on the government's witness list as well as statements by persons whose names did appear. They asserted no basis for admissibility of the non-witness statements other than a hope that they would contain some exculpatory material. Accordingly, we held the district court's order to be invalid under rule 17(c) to the extent it sought non-witness material. 630 F.2d at 146. We found, however, that statements of persons on the government's witness list may be inconsistent with trial testimony and admissible for impeachment purposes. 630 F.2d at 144. We recognized that "because such statements ripen into evidentiary material for purposes of impeachment only if and when the witness testifies at trial, impeachment statements, although subject to subpoena under rule 17(c), generally are not subject to production and inspection by the moving party prior to trial." Id. Nevertheless, because in camera review would aid the district court's trial preparation, we held that the district court's order to produce statements by witnesses for in camera inspection before trial was not an abuse of discretion under rule 17(c). Id. at 145.
 
 
 8
 After remand from this court, CBS submitted to the district court for in camera review transcripts and audio tapes of three interviews with two persons whose names appear on the government witness list. After some skirmishing over and a hearing on related matters, the court ruled that the witness statements would materially aid the defendants and therefore would be turned over to them before trial under the rationale of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).
 
 
 9
 The present conflict emerged from that decision. This court had approved in camera inspection of witness statements for the purpose of deciding whether they would have impeachment value; if so, they could be turned over to the defendants during the trial after the particular government witness had testified. On remand, however, the district court determined that these statements could be turned over to the defendants after commencement of trial but before the witnesses testified because they qualified as exculpatory evidence. It entered an order on March 24, 1981, directing disclosure of the materials to defendants on March 30, 1981. The district court's ruling is the subject of the appeal at No. 81-1467 and the mandamus petition at No. 81-1470. On March 25, Judge Gibbons granted a stay of the order, and on March 28, a motions panel consisting of Chief Judge Seitz and Judge Adams extended the stay pending a decision on the merits. The other petition for writ of mandamus, at No. 81-1485, challenges the district court's ruling of March 23, 1981, which required CBS to submit certain non-witness material to enhance intelligibility of the witness statements. Although no formal order directing this submission has been filed, CBS filed this second petition for writ of mandamus on March 28.
 
 II.
 
 10
 We address first the appealability of the proceedings at No. 81-1467. Apart from the necessity of establishing our jurisdiction, we must determine whether we may hear the case as an appeal from a final order or on original review of a petition for writ of mandamus. The distinction is one with a difference. On appeal, our scope of review is plenary: we review the court's choice, interpretation, and application of a legal precept. If an exercise of discretion by the district court is challenged, we determine whether the discretion was abused. If facts found by the trial court are controverted, we apply the "clearly erroneous" rule. By contrast, the peremptory writ of mandamus has generally been used to confine an inferior court to a lawful exercise of its prescribed jurisdiction or to compel it to exercise its authority when it has a duty to do so. An arbitrary and technical definition of "jurisdiction" has been avoided and, for present purposes, we note that mandamus is proper to confine a lower court to the terms of an appellate tribunal's mandate. In each case the petitioner has the burden of showing that its right to mandamus relief is " 'clear and indisputable.' " Will v. United States, 389 U.S. 90, 95-98, 88 S.Ct. 269, 273-275, 19 L.Ed.2d 305 (1967) (quoting Bankers Life & Casualty Co. v. Holland, 346 U.S. 379, 384, 74 S.Ct. 145, 148, 98 L.Ed. 106 (1953)); see also Will v. Calvert Fire Insurance Co., 437 U.S. 655, 662, 98 S.Ct. 2552, 2557, 57 L.Ed.2d 504 (1978) (plurality opinion).
 
 
 11
 Both the government and the defendants argue that the district court's order is not appealable because CBS was not held in contempt. They rely on the familiar precept that in criminal cases the final decision is the judgment of sentence, and that with limited exceptions only the final decision is appealable. One such exception is found in the line of decisions holding that although a refusal to quash a subpoena is not appealable, an appeal does lie in favor of a grand jury witness who disobeys a court order to respond and is thereafter held in contempt. See United States v. Nixon, 418 U.S. 683, 691, 94 S.Ct. 3090, 3099, 41 L.Ed.2d 1039 (1974); United States v. Ryan, 402 U.S. 530, 533, 91 S.Ct. 1580, 1582, 29 L.Ed.2d 85 (1971); Cobbledick v. United States, 309 U.S. 323, 60 S.Ct. 540, 84 L.Ed. 783 (1940); see In re Grand Jury Proceedings (Appeal of FMC Corp.), 604 F.2d 804, 805 (3d Cir. 1979). "At that point the witness' situation (becomes) so severed from the main proceedings as to permit an appeal." Cobbledick, 309 U.S. at 328, 60 S.Ct. at 542.
 
 
 12
 Appellees fail to recognize, however, that contempt citations are not the exclusive means by which third parties may appeal from trial court discovery orders. We have also held that a third party may intervene in a criminal trial to challenge production of subpoenaed documents on the ground of privilege and may appeal from an order granting less protection than that claimed. See United States v. RMI Co., 599 F.2d 1183, 1186-87 (3d Cir. 1979); cf. In re Grand Jury Empanelled October 18, 1979 (Appeal of Hughes), 633 F.2d 282, 286 (3d Cir. 1980) (third party appeal from enforcement of a grand jury subpoena); In re Matter of Grand Jury Applicants (C. Schmidt & Sons, Inc.), 619 F.2d 1022, 1024-25 (3d Cir. 1980) (third party appeal from enforcement of a grand jury subpoena). The decisions therefore perceive a distinction between a person named in a subpoena who must withstand contempt proceedings before lodging an appeal, and a person not named in a subpoena but who nevertheless asserts privilege in materials subject to court order.
 
 
 13
 We note that at present CBS is neither a recipient of an outstanding subpoena nor a witness, but asserts a substantial claim of privilege to materials held by the district court. The noncustodian who asserts an interest in the documents is not subject to the contempt requirement. The conceptual basis for the dichotomy is found in the teachings of Perlman v. United States, 247 U.S. 7, 38 S.Ct. 417, 62 L.Ed. 950 (1918), in which, as part of a settlement in a patent case, Perlman left certain exhibits with the district court. When the district judge turned the exhibits over to a grand jury at the request of the United States Attorney Perlman appealed. The Court allowed the appeal, noting that otherwise Perlman would be "powerless to avert the mischief of the order ...." Id. at 13, 38 S.Ct. at 419. See also United States v. Nixon, 418 U.S. at 690-92, 94 S.Ct. at 3098-3099; Gravel v. United States, 408 U.S. 606, 608-09 n.1, 92 S.Ct. 2614, 2618-2619 n.1, 33 L.Ed.2d 583 (1972); In re Grand Jury Proceedings (Appeal of Cianfrani), 563 F.2d 577, 580 (3d Cir. 1977); In the Matter of Grand Jury Empaneled January 21, 1975 (Appeal of Freedman), 541 F.2d 373, 376-77 (3d Cir. 1976).
 
 
 14
 Distilled from these cases is the precept: "persons affected by the disclosure of allegedly privileged materials may intervene in pending criminal proceedings and seek protective orders, and if protection is denied, seek immediate appellate review." United States v. RMI Co., 599 F.2d at 1186. Application of this precept is especially appropriate in this case. In Cuthbertson I, CBS sustained a contempt citation by refusing to comply with a subpoena. On appeal, we also ordered CBS to submit some documents to the district court for in camera review, and the Supreme Court denied defendants' petition for a writ of certiorari. After denial of the petition for writ of certiorari, CBS had no alternative but to comply by submitting the documents. CBS is not challenging, and indeed under the law of the case it is foreclosed from challenging, the order to submit the witness materials to the district court for an in camera inspection. Other issues regarding actual disclosure of the materials to the defendants and use of the materials at trial had not yet arisen at the time of the first appeal, and therefore were not before this court.
 
 
 15
 We conditioned our mandate, however, by limiting in camera inspection to examination of the documents to determine their possible value in impeaching government witnesses. Only after the district court had the materials in its possession did it announce its intention to allow the defendants to examine them prior to the witnesses' trial testimony. Because the trial court was already in possession of the materials as a result of the earlier appeal, it was impossible for CBS to generate an appealable order by resisting production and incurring contempt sanctions.
 
 
 16
 In the absence of the more lenient methods of appealing interlocutory orders available to civil litigants under 28 U.S.C. § 1292(b) and Fed.R.Civ.P. 54(b), a steadfast requirement that CBS incur contempt before appealing would foreclose it from obtaining review of important issues likely to arise after it submits the documents to the district court. Such a rule would be disadvantageous both to CBS and to the development of this uncertain area of the law. In addition, an invariable requirement of a contempt citation as a ticket to appellate review would work at cross purposes with our earlier admonition that "trial courts should be cautious to avoid an unnecessary confrontation between the courts and the press." Riley v. City of Chester, 612 F.2d 708, 718 (3d Cir. 1979). Under these circumstances we believe that the teachings of Perlman and United States v. RMI apply. We therefore conclude that the district court's order releasing these materials to defendants was a final order for purposes of appeal.[1] We now address the merits of the CBS appeal.
 
 III.
 
 17
 CBS contends that the materials do not qualify as exculpatory evidence retrievable under rule 17(c), and that the defendants have not met the standards for compelling disclosure of press materials under our decisions in Riley, Cuthbertson, and Criden because they have not demonstrated that this privileged material is the only source of the desired information. We agree on both points.A.
 
 Rule 17(c) provides:
 
 18
 A subpoena may also command the person to whom it is directed to produce the books, papers, documents or other objects designated therein. The court on motion made promptly may quash or modify the subpoena if compliance would be unreasonable or oppressive. The court may direct that books, papers, documents or objects designated in the subpoena be produced before the court at a time prior to the trial or prior to the time when they are to be offered in evidence and may upon their production permit the books, papers, documents or objects or portions thereof to be inspected by the parties and their attorneys.
 
 
 19
 The Supreme Court has determined that a rule 17(c) subpoena reaches only evidentiary materials. "In short, any document or other materials, admissible as evidence, obtained by the Government by solicitation or voluntarily from third persons is subject to subpoena." Bowman Dairy Co. v. United States, 341 U.S. at 221, 71 S.Ct. at 679 (emphasis added). The Court extended the admissibility requirement of rule 17(c) to materials held by third parties in United States v. Nixon, 418 U.S. at 699-700 n. 12, 94 S.Ct. at 3103-3104 n. 12. See also United States v. Iozia, 13 F.R.D. 335, 338, 340-41 (S.D.N.Y.1952). Neither the government nor the defendants have explained how the CBS materials could be admissible as evidence, unless the interviewees testified and made inconsistent statements.
 
 
 20
 We believe that the basic error of the district court in its discussion of the statements' potential lay in its failure to discriminate between potential exculpatory material in the possession of the prosecution, generally available under the teachings of Brady v. Maryland, and exculpatory evidence in the possession of third parties. Only the latter is retrievable under a rule 17(c) subpoena; naked exculpatory material held by third parties that does not rise to the dignity of admissible evidence simply is not within the rule. That is the teaching of Bowman Dairy and Nixon, and we applied it in Cuthbertson I.
 
 
 21
 The appellees in this case have not demonstrated, nor does our research disclose, any potential use of the present materials as evidence in the trial other than for purposes of impeachment. On their face, these materials are simply hearsay. Neither the government nor defendants have asserted a relevant exception to the hearsay rule. See Fed.R.Ev. 802. Only after a witness has testified will his prior inconsistent statement cease to be hearsay, see Fed.R.Ev. 801(c), but we are unable to speculate on the likelihood of that occurrence.
 
 
 22
 Accordingly, as a matter of law the materials may not be obtained at this time by a rule 17(c) subpoena. Because the district court's in camera possession is based on the necessity of evaluating the material against the evidentiary requirement of rule 17(c), it may not release the material to the parties unless that requirement is met. It failed to make such a determination of admissibility in this case, and we therefore reverse its order releasing the materials to the defendants.
 
 B.
 
 23
 We also reverse the district court's order for a separate and independent reason. We are persuaded that the defendants failed to meet the test consistently announced in this court's Riley-Cuthbertson-Criden trilogy of fair trial-free press cases. We have held that to overcome the media's federal common law qualified privilege the seeker of the information must demonstrate that his only practical means of access to the information sought is through the media. In our most recent decision in the reporters' privilege context, United States v. Criden, 633 F.2d 346 (3d Cir. 1980), cert. denied 449 U.S. 1113, 101 S.Ct. 924, 66 L.Ed.2d 842 (1981), we reviewed our prior decisions in Cuthbertson I and Riley and cited three criteria that must be met before a reporter may be compelled to disclose confidential information:
 
 
 24
 First, the movant must demonstrate that he has made an effort to obtain the information from other sources. Second, he must demonstrate that the only access to the information sought is through the journalist and her sources. Finally, the movant must persuade the Court that the information sought is crucial to the claim.
 
 
 25
 633 F.2d at 358-59. In this case, the identities of the possible witnesses are available from the witness list. The statements were made by franchisees and potential franchisees, with whom the defendants have had business relationships. Defense counsel have conceded that "(w)e know because of the dealings that the defendants have had with all the franchisees, who all of these people are."[2]
 
 
 26
 Appellees have not indicated, and we do not perceive, why the defendants may not themselves interview these same interviewees, whose identities they know, to obtain the desired information. In contrast, the defendants in Criden had already cross-examined the self-avowed source, and the testimony of the reporter in that case was relevant to the source's credibility. In this case, the sources have not yet testified. If their testimony at trial differs from their statement to CBS, the defendants will have the opportunity to obtain the materials for impeachment purposes. As we have heretofore observed in this respect, prior statements of prospective witnesses are "unique bits of evidence that are frozen at a particular place and time." Cuthbertson I, 630 F.2d at 148.
 
 
 27
 Accordingly, even if the defendants could have met the requirements under rule 17(c), the materials would not be available to defendants in this case because defendants failed to prove an element necessary to overcome the media's qualified privilege: that the only practical access to the information sought is through the media source.[3]
 
 IV.
 
 28
 Our conclusion that the evidentiary potential of the witness statements will arise only when the witnesses testify governs our disposition of the second petition for writ of mandamus, at No. 81-1485. It is our understanding that, at the time the second petition was filed in this court, no formal order on this issue had been entered by the district court. Brief for Appellant at 16. Moreover, the threshold determination giving rise to the appeal and the first petition that the materials contain exculpatory information to which defendants are entitled was not made with regard to the non-witness materials. Therefore, the second petition for writ of mandamus is not ripe, and we need not now address it.
 
 V.
 
 29
 Accordingly, in appeal No. 81-1467, the district court's order of March 24, 1981, releasing the witness materials to the defendants, will be reversed and the cause remanded for further proceedings consistent with this opinion. In No. 81-1470, the petition for writ of mandamus will be dismissed as moot; in No. 81-1485, the petition for writ of mandamus will be dismissed as not ripe.
 
 
 30
 SEITZ, Chief Judge, concurring.
 
 
 31
 I agree with the majority that the district court's order is appealable under Perlman v. United States, 247 U.S. 7, 38 S.Ct. 417, 62 L.Ed. 950 (1918), and subsequent cases interpreting that opinion. I also agree that the CBS materials cannot at this time be obtained by a rule 17(c) subpoena, except to the extent that they may be used for impeachment purposes after the witnesses testify at trial, because they do not meet the evidentiary requirement of rule 17(c).
 
 
 32
 I write separately because I do not believe that our conclusion that the materials may not be produced under rule 17(c) for other than impeachment purposes ends our inquiry. The district court held that even if the materials were not producible under rule 17(c), it had an independent obligation similar to that imposed on the prosecution in Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), to disclose to the defendants any material that it deemed to be "exculpatory." In light of this holding, I believe that the question whether the district court has an obligation independent of rule 17(c) to release the CBS materials must be reached. Further, I do not believe that the question whether the defendants have demonstrated pursuant to Riley v. City of Chester, 612 F.2d 708 (3d Cir. 1979), that the only practical means of access to the information is through the media should be reached unless it is first determined that the district court had the authority to release the materials.
 
 
 33
 The CBS materials came into the possession of the district court as a result of our opinion in United States v. Cuthbertson, 630 F.2d 139 (3d Cir. 1980), cert. denied, 449 U.S. 1126, 101 S.Ct. 945, 67 L.Ed.2d 113 (1981) (Cuthbertson I ). In Cuthbertson I, we reviewed the district court's order that CBS produce for in camera inspection before trial: (1) statements of the persons on the government witness list, and (2) statements of all franchisees or potential franchisees. Following the lead of the Supreme Court in United States v. Nixon, 418 U.S. 683, 703, 94 S.Ct. 3090, 3105, 41 L.Ed.2d 1039 (1974), we determined that the question of CBS's privilege need not be reached unless the requirements of rule 17(c) had been met. In determining whether the requirements of rule 17(c) had been met, we emphasized that the material sought by the rule 17(c) subpoena must be evidentiary and relevant. Cuthbertson I, 630 F.2d at 144. See United States v. Nixon, 418 U.S. at 699-700, 94 S.Ct. at 3103, 3104.
 
 
 34
 The only evidentiary use that the defendants could advance at that time was that the witness statements could be used for impeachment purposes. We recognized that statements cannot become admissible for impeachment purposes until after a witness testifies inconsistently with such statements. Therefore, ordinarily they are not producible under rule 17(c) until after the witness testifies at trial. However, we held that the district court had not abused its discretion in requiring pretrial production of the witness statements for in camera inspection because such inspection would assist the district court in its preparation for ruling on whether to disclose statements to the defendants at trial. We believed that allowing in camera review would help avoid unnecessary delays and disruptions of the trial. We emphasized that "(u)nder the district court's order, the defendants will get such statements, if at all, only after the witness testifies at trial." 630 F.2d at 145.[1] It is clear from a review of our opinion in Cuthbertson I that we contemplated that the district court would review the materials in camera only to facilitate its determination whether any statements could be admitted into evidence for impeachment purposes after the witness testified at trial. Further, we admonished that "(c)ourts must be careful that rule 17(c) is not turned into a broad discovery device, thereby undercutting the strict limitation of discovery in criminal cases found in Fed.R.Crim.P. 16." 630 F.2d at 146. See also Gilmore v. United States, 256 F.2d 565 (5th Cir. 1958).
 
 
 35
 It is equally clear from a review of the district court opinion that the court decided to disclose the statements to the defendants without determining that they were producible under rule 17(c). In fact, the district court implied that the statements could not be reached by a subpoena under rule 17(c) because they probably would not be deemed "evidentiary." The district court, however, did not view the issue to be whether the materials were producible under rule 17(c). Instead, the court stated that it "has an obligation beyond that of disinterested third parties to the administration of justice." Because it believed that the CBS materials would be helpful to the defense, it found that it had a duty to disclose this information.
 
 
 36
 Apparently, the district court believed that its duty to disclose these materials arose from the due process clause. The court believed that it had a constitutional duty similar, if not identical, to the duty imposed on the prosecution in Brady to disclose exculpatory evidence to the defendant. Whether the due process clause imposes a Brady -type obligation on federal judges is a substantial question that has not been directly addressed by this court. Cf. United States v. Dansker, 537 F.2d 40, 61 (3d Cir. 1976), cert. denied, 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977) (Jencks Act obligations apply only to prosecution and not to court). Most of the United States Courts of Appeals that have addressed this issue have held that the requirements of Brady apply only to the prosecution and not to the court itself. See, e. g., United States v. Hutcher, 622 F.2d 1083 (2d Cir. 1980), cert. denied, 449 U.S. 875, 101 S.Ct. 218, 66 L.Ed.2d 96 (1980); United States v. Greathouse, 484 F.2d 805 (7th Cir. 1973). But see United States v. Figurski, 545 F.2d 389 (4th Cir. 1976).
 
 
 37
 The reluctance of these courts to impose such an obligation on federal judges is understandable. A judge often observes material that may be helpful to a defendant. Such material may come to the judge's attention in proceedings other than the defendant's criminal trial or, as in this case, it may come from a source that claims a privilege not to disclose the material to the defendant. The privilege claimed may be absolute, such as the attorney-client privilege, or it may be qualified, as is the first amendment privilege claimed in this case.
 
 
 38
 When a privilege claim arises, a district court may utilize the in camera device. In camera inspection is often used when a party believes it has materials that should not be disclosed pursuant to a subpoena. See, e. g., United States v. Nixon, 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974) (executive privilege); United States v. O'Neill, 619 F.2d 222 (3d Cir. 1980) (executive privilege); In re Grand Jury February 14, 1978 (Markowitz), 603 F.2d 469 (3d Cir. 1979) (attorney-client and fifth amendment privileges). By employing this protective device, the person opposing disclosure can obtain an impartial determination of whether the documents contain material that is producible under the subpoena and, in the case of a qualified privilege, whether such material is subject to disclosure under an appropriate balancing test. In camera inspection provides for this determination without causing the documents to lose their confidential status. In order to protect expectations of confidentiality, we have recognized a judicially created privilege that attaches to information disclosed in the course of an in camera proceeding. See, e. g., Markowitz, 603 F.2d at 474-75. This privilege was created to ensure that such information does not lose its confidential status merely because it has been disclosed to a district judge.
 
 
 39
 When viewing materials in camera, the district court has important obligations. In United States v. Nixon, the Supreme Court discussed these obligations. Regardless of the strength or weakness or even the applicability of the asserted privilege, the Court recognized that "(i)t is elementary that in camera inspection of evidence is always a procedure calling for scrupulous protection against any release or publication of material not found by the court, at that stage, probably admissible in evidence and relevant to the issues of the trial for which it is sought." United States v. Nixon, 418 U.S. at 714-15, 94 S.Ct. at 3110-3111.
 
 
 40
 Given the kinds of material that a district court may view in camera, and the deeply held privacy interest or privilege of the person opposing disclosure, I believe that a district court should consider in camera material to be in its possession for a limited purpose only. Therefore, ordinarily a district court should not consider the merits of the asserted privilege, much less decide to disclose the material, until after it has determined that the party seeking disclosure would have the right to compel production of the material if it were still in the hands of the person opposing disclosure. Otherwise, a device intended to protect the person opposing disclosure could be converted into a device by which that person must disclose material that could not have been obtained from it directly. This would not only undermine the integrity of the in camera device but also would greatly expand the discovery rights of criminal defendants. Ironically, this expansion would come at the expense of those third parties who claim to have a privilege not to comply with a criminal defendant's established discovery rights.[2]
 
 
 41
 As the foregoing discussion illustrates, federal judges have important obligations that are not imposed on the prosecution. Therefore, if the due process clause does impose on federal judges a Brady -type obligation to disclose certain materials to a criminal defendant, I believe that such a duty certainly can be no greater than the prosecution's constitutional duty to disclose exculpatory material when there has been a general, as opposed to a specific, request to produce such material. See United States v. Agurs, 427 U.S. 97, 106-07, 96 S.Ct. 2392, 2398-2399, 49 L.Ed.2d 342 (1976).[3] Assuming for purposes of this appeal that such a duty exists, the question remains whether the witness statements in the CBS tapes triggered this duty to disclose.
 
 
 42
 The prosecution is required to disclose material only when nondisclosure would deprive the defendant of the right to a fair trial. See United States v. Agurs, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342. In finding that the prosecution's failure to disclose evidence did not deprive the defendant of her right to a fair trial, the Agurs Court emphasized that the undisclosed evidence must be "constitutionally material." To determine whether the prosecution's nondisclosure meets this standard, a court may not use the customary harmless-error standard. According to the Agurs Court, "the constitutional standard of materiality must impose a higher burden on the defendant." Id. at 112, 96 S.Ct. at 2401. It is not sufficient that the undisclosed evidence might have affected the jury's verdict. There has been constitutional error only "if the omitted evidence creates a reasonable doubt that did not otherwise exist." Id. (emphasis added). I believe that the statements in the CBS tapes must be judged under this standard to determine whether the district court had the authority to release them to the defendants.
 
 
 43
 In this case, the question whether there was a Brady -type obligation to disclose arises in a most unusual posture. In the ordinary Brady case, it is only after a judgment of conviction that a court reviews the failure of the prosecution to disclose material the defendant argues should have been admitted into evidence. In this case, the Brady question has arisen before trial. The Agurs Court, however, reasoned that the same standard logically applies to both an initial decision to disclose and a postconviction determination whether nondisclosure deprived a defendant of his or her due process rights at trial. See id. at 108, 96 S.Ct. at 2399. I recognize that because one cannot predict how a trial may develop it is often difficult and somewhat impractical to determine before trial whether the failure to disclose certain material would meet the Agurs standard.[4] However, in this particular case the difficulty of predicting the course of the trial is not as crucial as it might otherwise be: if the statements in question are to be produced under a Brady theory, it is because they ultimately will not be admissible at trial. Otherwise, in accordance with our opinion in Cuthbertson I, the district court could order them disclosed under rule 17(c) after engaging in the appropriate balancing. See Cuthbertson I, 630 F.2d at 148.
 
 
 44
 I have considerable difficulty imagining when the failure to disclose nonevidentiary material could result in a reversal of conviction under the standard announced in Agurs. The Agurs Court made it clear that there is no constitutional obligation on the prosecution to disclose all materials that would be helpful to the defendant in preparing the defense. If there were such an obligation, the prosecution would be obliged to "open its files" because it obviously would be helpful for the defendant to know the government's entire case, including incriminating, as well as exculpatory, evidence. However, I will assume for purposes of this appeal that there might be a case in which the failure to disclose nonevidentiary material could result in a reversal of conviction. I believe that at a minimum such nonevidentiary material would have to lead directly to evidence that meets the standard articulated in Agurs in order to trigger a constitutional duty to disclose. Otherwise, the Brady obligation would be transformed from a minimal constitutional obligation into a constitutional right to discovery.
 
 
 45
 I have examined the tapes in question and I believe that they do not contain any material that meets the Agurs standard. Because appellate courts have an obligation, similar to that imposed on the district courts, to keep material that we view in camera confidential, I must be circumspect in explaining the nature of the material in the CBS tapes that could be viewed as helpful to the defense. I emphasize that in this review I am concerned only with those statements that ultimately prove to be inadmissible. If the statements prove to be admissible, the district court can order disclosure to the defendants after completing the appropriate balancing.
 
 
 46
 My review of the CBS tapes convinces me that the district court's use of "exculpatory" was intended in a very broad sense of that word. I do not disagree with the district court's conclusion that listening to the tapes or reading the transcripts might assist the defendants in preparing their defense. In these interviews, Mike Wallace plays the role of an adept cross-examiner. He asks leading questions, at times trying to imply that the interviewees might have been somewhat at fault in the failure of the franchising operation. He also questions whether persons of the interviewees' backgrounds could actually be "duped" into investing into such a scheme. There is no doubt that listening to these questions and to the responses and conversations of the potential government witnesses would benefit the defendants. It would enable them to view the manner in which these potential witnesses handled the equivalent of a rigorous cross-examination and perhaps indicate in which areas of cross-examination the witnesses appear the most likely to falter. However, at no point in these interviews did the interviewees affirmatively indicate that they believed either that the defendants were not at fault or that they themselves were at fault. Their statements would not be admissible for purposes other than impeachment. They do not qualify as statements against interest, nor do they appear to meet any other exception to the hearsay rule. Further, I do not believe that the statements would lead the defendants to admissible evidence that would meet the "constitutionally material" standard of Agurs. Therefore, even if the district court was correct in deciding that it has a Brady -type obligation, I do not believe that it was a permissible exercise of discretion to find that these materials triggered such an obligation.
 
 
 47
 For these reasons, I agree that the order of the district court should be reversed.[5] Because I do not believe that the district court had the authority to release these statements in the first place, I express no opinion on the conclusion of the majority that the defendants did not meet the burden of demonstrating under Riley v. City of Chester, 612 F.2d 708 (3d Cir. 1979), that they could not obtain this material from a nonmedia source.
 
 
 
 [1]
 Our decision to review the issues on appeal necessarily requires dismissal of the parallel petition for writ of mandamus, at No. 81-1470, as moot
 
 
 [2]
 Tr. at 91 (District Court hearing March 4, 1980) (Quoted in Letter to the Court from Timothy B. Dyk, Esq., Counsel for CBS, Inc. (dated April 16, 1981))
 
 
 [3]
 In the view we take it is not necessary to address the alternative grounds for reversal urged by appellant. We do not meet the contention that the teachings of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), apply only to materials in possession of the prosecution and not to materials in possession of a court. We are of the view that the requirements for overriding the media privilege must be met before the Brady issue can be resolved, but that it is premature to reach the merits of this issue before the witnesses actually testify
 
 
 [1]
 As to the statements of the nonwitness franchisees or potential franchisees, we held that CBS could not be required to produce them even for in camera inspection because the defendants had not made a sufficient preliminary showing that these statements were evidentiary. 630 F.2d at 145-46. We found that the defendants' assertion that these statements might contain some exculpatory material did not justify enforcement of the subpoena under rule 17(c)
 
 
 [2]
 The courts have consistently held that rule 17(c) itself should not be used to expand a criminal defendant's discovery rights. See, e. g., United States v. Berrios, 501 F.2d 1207 (2d Cir. 1974). A fortiori, I do not believe that in camera inspection to determine whether materials are privileged from disclosure under a rule 17(c) subpoena should be used to expand a defendant's discovery rights
 
 
 [3]
 The Brady obligation imposed on the prosecution is based, at least in part, on the adversarial relationship between the prosecution and the defense; it is inherently unfair for the prosecution, which controls the development of the criminal trial, to have in its possession material, exculpatory evidence that is unavailable to the defense. Although the CBS material in the district court's possession has not been made available to the prosecution and thus might be more correctly characterized as information from a neutral third party discovered after trial, see Agurs, 427 U.S. at 111 & n. 10, 96 S.Ct. at 2401 & n. 10, I will refer to the district court's alleged obligation to disclose such material as a Brady -type obligation and will assume for purposes of this appeal that the court may be subjected to the same standard as the prosecution
 
 
 [4]
 Further, I recognize that because of this difficulty a prudent prosecutor will voluntarily resolve any doubts in favor of disclosure, and a district court, viewing the government's material in camera to determine whether it should be produced to the defense, might do the same. However, when a district court views nonprosecutorial material in camera, if the defendant is powerless to obtain such material directly from the person opposing disclosure, I believe that the court should disclose such material, if at all, only when the Constitution clearly compels it to do so
 
 
 [5]
 I also agree with the majority that it is not necessary to reach the merits of the petitions for writ of mandamus in Nos. 81-1470, -1485