**James CAMPBELL and Felix Sanchez, Petitioners,**

v.

**Hon. Johnny KLEVENHAGEN, Sheriff of Harris County, Texas and Hon. William T. Harmon, Judge of the 178th Judicial District Court of Harris County, Texas, Respondents.**

**Civ. A. No. H–91–339.**

United States District Court,
S.D. Texas,
Houston Division.

March 5, 1991.

William W. Ogden, Liddell Sapp, Zivley, Houston, Tex., for Campbell.

Tom Godbold and Bill Boyce, Fulbright & Jaworski, Houston, Tex., Stanley G. Schneider, for Sanchez.

Harris County Atty., Houston, Tex., Ann Hardy, for respondents.

## FINAL JUDGMENT

HOYT, District Judge.

The Court has reviewed the Report and Recommendation in this cause. The findings of fact and conclusions of law are adopted.

Because the adjudication of contempt is an unconstitutional violation of the petitioners' qualified privilege under the First Amendment, it is:

ORDERED that the application for writs of habeas corpus is GRANTED and the sentences of 30 days each and the fines of $500 each are set aside. In this regard, the respondent, Johnny Klevenhagen is ORDERED to release the petitioners from his custody, forthwith.

In the usual course of events, the parties are permitted to file written objections within 10 days pursuant to 28 U.S.C. § 636(b)(1)(C) and General Order 80–5, S.D. Texas. Because final judgment is being

entered at this time, the rules of post-judgment and appellate review will appertain upon entry of this judgment.

Finally, it is ORDERED that Judge William T. Harmon is DISMISSED from this proceeding.

## REPORT AND RECOMMENDATION

NANCY K. PECHT, United States Magistrate Judge.

Pending before the court are James Campbell's and Felix Sanchez' Applications for Writs of Habeas Corpus. The petitioners are reporters for the *Houston Chronicle* and *Houston Post*, respectively. They have been adjudged in criminal contempt for refusing to disclose confidential sources at a state murder trial.

After considering the pleadings on file, the evidence presented, and the argument of the parties, the court RECOMMENDS that the Applications for Writs of Habeas Corpus be GRANTED.

## I.

### *Introduction*

On May 20, 1990, the petitioners interviewed several teenagers about a double murder which had taken place the night before at a graduation party. The interviews, which were granted on condition of anonymity, resulted in the publication of two articles about the murder in each of the reporters' newspapers. David Charles Taylor was charged with both murders.

Taylor's defense attorneys subpoenaed the petitioners as witnesses at the trial. The petitioners appeared, but, asserting a qualified privilege under the first amendment, they defied the court's order to respond to defense counsel's request to reveal their confidential sources. The petitioners refused to state whether any witnesses, spectators, or other persons present in the courtroom were individuals with whom they had spoken on condition of anonymity. The petitioners were found in contempt of court by the Honorable William T. Harmon, Judge of the 178th Judicial District Court of Harris County, who

ordered that they be held in custody in his court during trial proceedings and pending sentencing for contempt. During the trial, the petitioners refused two additional opportunities to purge themselves of the contempt. Therefore, at the conclusion of the trial, they were each sentenced to thirty days in jail and fined $500.00.

The petitioners sought relief from the adjudication of contempt by writ of habeas corpus in the Court of Criminal Appeals. That court refused their application without comment.

This court has jurisdiction over this matter pursuant to 28 U.S.C. § 2241 and 2254. The petitioners were granted bail *pendente lite* by this court on February 7, 1991, and a hearing on these applications was held on February 11, 1991, before the undersigned magistrate judge.

The facts necessary to the resolution of this case are largely undisputed and are discernible from the record and exhibits submitted at the evidentiary hearing. At that hearing, the petitioners presented testimony from editors of the *Houston Chronicle* and *Houston Post* to support their assertion that a qualified privilege protecting reporters from disclosing confidential sources is necessary to the free flow of information to the press. Without the privilege, sources could not remain anonymous and would not come forward with information. In view of the court's conclusion that the reporters may assert a qualified privilege under the first amendment and under the law of the Fifth Circuit, the editors' testimony regarding the need for the privilege will not be discussed in this report.

## II.

### *Findings of Fact*

On May 20, 1990, reporters James Campbell and Felix Sanchez went to the Houston neighborhood where the murders had occurred the previous day. They interviewed several teenagers who asked to remain unidentified. Campbell and Sanchez each wrote an article about the murders which

appeared in their respective publications on May 21, 1990.

Campbell's article reported that David Charles Taylor was charged with the murders of Percy Banyon and Calvin Sanders. The incident occurred outside a private residence where a graduation party was in progress. The account of the incident as related by the sources to Campbell corroborated Homicide Detective Talton's version of the events. Banyon apparently started the fight that led to the shootings. Taylor was one of five young people who arrived at the party late and got into an argument with Banyon and Sanders. When Banyon attempted to strike at one of the five with a bat, Taylor shot him. Sanders then grabbed the bat and was also shot. (The detective added that Taylor was carrying the firearm illegally.)

Sanchez reported that, according to county investigators and youngsters who attended the party, the shooting began when Taylor and his group arrived at the party and an argument erupted among Taylor's group, Banyon, and Sanders. When one of the five threatened Banyon and Sanders with a bat, a fistfight began. According to one of the partygoers, Banyon grabbed the bat and struck one of the five youngsters, who then pulled a gun and shot Banyon. Sanders then grabbed the bat and was also shot.

In August 1990, James Campbell and Felix Sanchez were each served with a subpoena *duces tecum*, issued at the request of Taylor's defense counsel. The subpoenas required Campbell and Sanchez to appear on September 21, 1991, as non-party witnesses in the murder trial of David Charles Taylor, pending in the 178th Judicial District Court of Harris County, Texas. (*State v. David Charles Taylor*, Cause No. 564,821.) Campbell's subpoena directed him to "list and provide to the court names and addresses of all persons interviewed re: This case-Reveal identities of persons mentioned in story of Monday May 21, 1990 who corroborated Detective M.H. Talton's account who are listed as having spoken on condition of anonymity [sic]". A similar subpoena *duces tecum*

directed to Sanchez required him to "provide names & addresses of all persons interviewed in reference to this case particularly reveal identity of individuals mentioned in story as having asked to remain unidentified on 5/21/90 [sic]".

Campbell and Sanchez filed motions to quash the subpoenas, asserting a qualified privilege from disclosure of confidential sources and objecting to being used as investigators for the defense. Both petitioners argued that the subpoena impermissibly impinged on their newsgathering activities protected by the first amendment. On September 21, 1990, Judge Harmon summarily denied the motions to quash. Thereafter, a hearing was held on the subject of the subpoenas. Sanchez produced his notes as ordered. Contained in those notes was a reference to a person named "Derick". However, Sanchez stated that he did not know the identities of the persons interviewed and that he would not recognize them if he saw them. Taylor's defense attorney, Kevin Oncken, stated that he wished to have Sanchez,

... on call under my subpoena throughout the trial. I may in fact have Mr. Sanchez present throughout the trial to view the witnesses who appear during the trial so that if one of the individuals that he talked to out there that morning are in fact present in court whether in the audience or on the witness stand, he recognizes those individuals we can then have that identification made so that we can talk to those individuals.
THE COURT: And the same holds true for Mr. Campbell?
MR. KEVIN ONCKEN: Yes, sir.

. . . . .

THE COURT:
No question about it, the potential for there to be some exculpatory information to have been gained ...

. . . . .

MR. KEVIN ONCKEN:
... [b]oth reporters can be required to view each of the witnesses for the State at one time at the outset of the trial ...

. . . . .

[T]he only way that we can adequately protect Mr. Taylor in the sense that we might otherwise overlook exculpatory evidence that would suggest to the jury that he was justified in the two homicides, the only way that we can avoid that from happening and protect Mr. Taylor is to have these individuals view all of the State's witnesses to determine whether any of those individuals were within the group that they spoke to for impeachment purposes as well; and, second, Your Honor, the only way to ensure that the identity of those individuals comes to the attention of the Defense is to have these gentlemen present during trial so that they can view the gallery, because you know from past experience in cases similar to this that many of the people in the community come out to watch and they may not end up on the witness stand on behalf of the defendant. At the same time they may in fact be the individuals that were talked to by either or both attorneys and if they are the defendant is entitled to know about that exculpatory evidence and present it on his behalf so that the jury can consider it during its deliberation.

THE COURT: Okay. Yes.

Sanchez' attorney objected to the order requiring Sanchez to "sit through a trial to help the defense attorney as a private investigator". However, Taylor's defense attorney, Mr. Oncken, insisted that,

These are potential defense witnesses these two men. Because if we find these individuals through their identification and those individuals deny their statements, then certainly these two individuals here, Mr. Campbell and Mr. Sanchez, become defense witnesses for impeachment purposes, and they're certainly material in that respect.

The court ruled that,

I'm going to require these reporters to come down here and look at these witnesses at their request, if I deem their request to be reasonable. I'm not going to make them sit throughout the whole trial. You know, this is not a violation of the rule against witnesses being present in the courtroom because they're not go-

ing to be sworn as witnesses. I am going to keep it, so long as their request is reasonable, I am going to grant it. I'm going to require these two guys to come down here and view these individuals when they testify to see if they can make an identification as to whether or not they were the individuals they talked to the following day.

The court stated that it would require the reporters to identify the witnesses or other persons in the gallery and that the reporters should remain on call to come to the courthouse and identify any persons who may appear during trial. The court added that if the reporters were able to identify a witness and to impeach that witness' testimony, then the court would examine the witness' reasons for confidentiality.

Campbell also testified that he did not know the names of the persons whom he had interviewed, and that he would not recognize them if he saw them. He stated that he had discarded all his notes of the interview. He added that he had given defense counsel all his information about the events.

Campbell and Sanchez were each served with a second subpoena requiring them to appear on October 8, 1991, as witnesses. Each reporter filed a second motion to quash which, following a second hearing on October 8, 1991, was denied.

The judge ruled that the defense had met its burden to overcome the petitioners' assertion of a qualified first amendment privilege as announced in *Channel Two Television Co. v. Dickerson*, 725 S.W.2d 470 (Tex.App.—Houston [1st Dist.] 1987, no writ). The court in *Dickerson* ruled that a party seeking to overcome such a privilege must make a clear and specific showing that the information sought is (1) highly material and relevant, (2) necessary or critical to the maintenance of the claim, and (3) not obtainable from other available sources.

The defense attorneys again insisted that they required the reporters' presence on each day of trial, so each reporter could

view witnesses and spectators and possibly identify one of the persons he had interviewed. It was also established at this hearing that the State of Texas had supplied its list of witnesses to the defense, and that the defense had a court-appointed investigator who was attempting to locate individuals mentioned in Sanchez' notes and who may have spoken with the reporters. The court ordered the reporters to appear in court, to remain on call to identify any of their sources who might be present, and to impeach a source's testimony if necessary. The court added:

And I completely agree with, I believe, Mr. Godbold's opening statement that this is absolutely highly speculative. But it's absolutely necessary.

The trial court entered an order on October 18, 1990 confirming and carrying over the subpoenas served upon Campbell and Sanchez until the trial date of February 4, 1991, and ordering the reporters to be available and on call for the court. Each petitioner sought leave to file a petition for writ of mandamus in the Fourteenth Court of Appeals; leave was denied on October 17, 1990. The petitioners also filed motions for leave to file a petition for writ of mandamus in the Court of Criminal Appeals and those motions were denied on January 17, 1990.

The affidavit of the defendant's attorney (offered by Respondent Klevenhagen at the evidentiary hearing, and attached to Respondent Harmon's Exhibit No. 2) also indicates that the defendant required the petitioners to appear and testify as "potential impeachment witnesses".

On February 5, 1991, both reporters appeared at trial in compliance with the subpoenas and with the court's order of October 18, 1990. Before the jury was seated and before the taking of any testimony, the reporters were advised that they were still under the oath or affirmation given at the earlier hearings. Each was asked to respond to defense counsel's inquiry by viewing six to eight persons in the courtroom, stating whether or not he recognized any as being a person with whom he had spoken about the murder, on condition of ano-

nymity. The court also acceded to the defense counsel's request that after Campbell and Sanchez surveyed the individuals present, the attorney would be permitted to confer with the reporters before the reporters were released, subject to their being recalled to perform the process again. The reporters refused to respond to the question posed and were admonished that their refusal constituted contempt, punishable by up to six months in jail and a $500.00 fine. The reporters continued to refuse to respond, and were adjudged in contempt and ordered into the sheriff's custody. That evening the petitioners were released on $500.00 bond. At this hearing, counsel for Campbell confirmed that,

We understand a purpose of the subpoena to be—to verify remarks made by a detective who is quoted in his published newspaper article as an attributed source dealing with this story.

We have no objection to that—to his being here to testify for that purpose. We do reserve our objections to his being down here for reasons other than testifying about potentially material and relevant facts.

.     .     .     .     .

... I believe it is clear Mr. Campbell and Mr. Sanchez are refusing the, one, exercise requested of them by Mr. Oncken. As I stated at the outset, they are not refusing to testify from the witness stand as to material attributed facts published in their article and were in their knowledge.

On February 5, 1991, the Court of Criminal Appeals refused their applications for habeas corpus relief.

On February 6, 1991, the petitioners were again asked to state whether or not individuals in the courtroom were persons whom they had interviewed in connection with the murder. They refused to respond and were ordered back into custody as before, but released on bond in the evening.

On February 7, 1991, the judge again gave the petitioners the opportunity to purge themselves of the contempt. After six witnesses for the State testified that they did not speak with Sanchez or Camp-

bell or with any other news reporters, Sanchez and Campbell were asked whether any of these six witnesses was a confidential source for the articles. Sanchez and Campbell again refused to respond and the judge sentenced them both to thirty days in jail and imposed a $500.00 fine. Bond was denied.

### III.

### Conclusions of Law

The petitioners' request for habeas corpus relief is founded on their assertion of a reporter's qualified privilege under the first amendment. They claim that this qualified privilege permits them to refuse to disclose confidential sources under compulsion of subpoena absent a showing that the testimony is highly material and relevant, necessary to the maintenance of the claim and unavailable from other sources. The reporters also argue that the state trial judge exceeded his authority under the sixth amendment's guarantee to accused persons "to have compulsory process for obtaining witnesses in [their] favor" by compelling them to act as investigators for the defense.

Respondent, Johnny Klevenhagen, argues that the petitioners have no qualified privilege to withhold documents or testimony at a criminal trial, or, alternatively, that the defendants have shown the necessity for the information and have overcome the qualified privilege. Respondent also contends that Judge Harmon has the authority to enforce his jurisdiction by the contempt sanction.[1]

■ The issues in the instant petition present mixed questions of fact and law; therefore, as a threshold matter, this court is not required to accord a presumption of correctness to the state court's determination of the factual issues. *O'Bryan v. Estelle*, 714 F.2d 365, 403 (5th Cir.1983), *cert. denied*, 465 U.S. 1013, 104 S.Ct. 1015, 79 L.Ed.2d 245 (1984). *See Townsend v. Sain*, 372 U.S. 293, 309 n. 6, 83 S.Ct. 745, 755 n.

6, 9 L.Ed.2d 770 (1963); 28 U.S.C. § 2254(d). Further, on the basis of the record before the court, facts critical to the resolution of the issue of privilege may be re-examined under 28 U.S.C. § 2254(d)(3).

The seminal Supreme Court decision relied upon by both parties in support of their opposed views on the existence of a reporter's qualified privilege is *Branzburg v. Hayes*, 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972). That opinion was rendered by a plurality of four justices with a concurrence by Justice Powell. According to Justice Brennan (a dissenter in *Branzburg*), the Court in *Branzburg* held "that the First Amendment does not provide newsmen with an absolute or qualified testimonial privilege to be free of relevant questioning about sources by a grand jury." *In re Roche*, 448 U.S. 1312, 1314, 101 S.Ct. 4, 6, 65 L.Ed.2d 1103 (1980) (stay of contempt order granted to reporter who refused to disclose sources in connection with a disciplinary proceeding against judge). Justice Brennan went on to write that,

[a]t the same time, there is support for the proposition that the First Amendment interposes a threshold barrier to the subpoenaing of confidential information and work product from a newsgatherer. Four dissenting Justices in Branzburg discerned at least some protection in the First Amendment for confidences garnered during the course of newsgathering ... And Mr. Justice Powell, who joined the Court in Branzburg, wrote separately to emphasize that requests for reporter's documents should be carefully weighed with due deference to the "vital constitutional and societal interests" at stake. Consequently, I do not believe that the Court has foreclosed news reporters from resisting a subpoena on First Amendment grounds.

*Id.* at 1314–1315, 101 S.Ct. at 6.

■ The Court of Appeals for the Fifth Circuit, citing *Branzburg*, has ruled that reporters have a qualified privilege to re-

---

1. Respondent Judge Harmon filed a motion to dismiss the petition against him in that he is not a proper party respondent to such a proceeding under 28 U.S.C. § 2254 and the Rules Governing Section 2254 Cases in the United States District Courts. *See also* 28 U.S.C. § 2243.

fuse to disclose confidential sources. *Miller v. Transamerican Press, Inc.*, 621 F.2d 721, 725 (5th Cir.), *modified on rehearing*, 628 F.2d 932 (5th Cir.1980), *cert. denied*, 450 U.S. 1041, 101 S.Ct. 1759, 68 L.Ed.2d 238 (1981). Respondents urge this court to limit that holding to civil cases, as the issue in *Miller* arose in the context of a suit for libel. However, three years after *Miller*, the Fifth Circuit unequivocally reaffirmed its earlier view that the first amendment protects reporters from unqualified compelled disclosure of confidential sources. In *In re Selcraig*, 705 F.2d 789, 792 (1983), the court wrote,

We have recognized that the first amendment shields a reporter from being required to disclose the identity of persons who have imparted information to him in confidence. *Miller v. Transamerican Press*, 621 F.2d 932 (5th Cir.), *modified on rehearing*, 628 F.2d 932 (5th Cir.1980), *cert denied*, 450 U.S. 1041, 101 S.Ct. 1759, 68 L.Ed.2d 238 (1981). Our course was dictated by our careful reading of the plurality and concurring opinions in *Branzburg v. Hayes*, 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972). The privilege, we held, is not absolute, but qualified.

The *Selcraig* court did not suggest that its holding was limited to civil cases (*Selcraig* was a civil rights action for denial of procedural due process by a discharged school district employee). Its ruling was issued in clear, declarative statements. It is noteworthy that in other circuits the qualified privilege has been extended to criminal proceedings. *See, e.g., United States v. Cuthbertson*, 630 F.2d 139, 147 (3rd Cir.1980), *cert. denied*, 449 U.S. 1126, 101 S.Ct. 945, 67 L.Ed.2d 113 (1981); *United States v. Cuthbertson*, 651 F.2d 189, 191, 195–196 (3rd Cir.), *cert. denied*, 454 U.S. 1056, 102 S.Ct. 604, 70 L.Ed.2d 594 (1981); *see also United States v. Caporale*, 806 F.2d 1487, 1504 (11th Cir.1986), *cert. denied*, 483 U.S. 1021, 107 S.Ct. 3265, 97 L.Ed.2d 763 (1987) (applying the Fifth Circuit's tripartite test for overcoming the assertion of the privilege); *United States v. Burke*, 700 F.2d 70, 77 (2d Cir.), *cert. denied*, 464 U.S. 816, 104 S.Ct. 72, 78 L.Ed.2d 85 (1983) (tripartite test applied).

As recognized by the court in *Cuthbertson*, 630 F.2d at 147, "the interests of the press that form the foundation for the privilege are not diminished because the nature of the underlying proceeding out of which the request for the information arises is a criminal trial." Nor is the privilege required to yield automatically because of the countervailing interest of the defendant under the sixth amendment. The court in *Cuthbertson*, quoting from *Nebraska Press Association v. Stuart*, 427 U.S. 539, 561, 96 S.Ct. 2791, 2803–04, 49 L.Ed.2d 683 (1976) wrote:

The authors of the Bill of Rights did not undertake to assign priorities as between First Amendment and Sixth Amendment rights, ranking one as superior to the other ... [I]f the authors of these guarantees, fully aware of the potential conflicts between them, were unwilling or unable to resolve the issue by assigning to one priority over the other, it is not for us to rewrite the Constitution by undertaking what they declined to do.

*Cuthbertson*, 630 F.2d at 147. The court in *Cuthbertson* ruled that the privilege extends not only to disclosure of confidential sources, but also to unpublished notes or other resource material held by the press. *Id.*, at 147.

Notwithstanding the urging of Respondents that this court not extend the privilege to criminal cases, and the recent decision in the Western District of Texas, *Karem v. Priest*, 744 F.Supp. 136 (W.D.Tex. 1990), which refused to recognize the existence of such a privilege when asserted in a criminal proceeding, it is not the prerogative of this court to dismiss the precedent of the circuit.

Before analyzing whether the defendant in the *Taylor* murder trial has overcome the assertion of the reporters' qualified privilege, the court will first address the petitioners' second ground for habeas corpus relief.

■ The petitioners argue that Judge Harmon exceeded his authority under the sixth amendment to compel attendance of

witnesses for the defense. Judge Harmon, having jurisdiction over the proceeding and persons in his court, had the authority to enforce his order by contempt. Persons wishing to resist such orders are put to a choice between compliance and contempt. *Maness v. Meyers,* 419 U.S. 449, 95 S.Ct. 584, 42 L.Ed.2d 574 (1978). No suggestion is made that the judge lacked jurisdiction over the persons or proceedings in his court.

Another question raised by petitioners' argument, however, is whether there is a constitutional dimension to the petitioners' refusal to testify on the ground that the sixth amendment guarantee also protects witnesses from compulsory process. The sixth amendment, provides:

"In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; *to have compulsory process for obtaining witnesses in his favor,* and to have the Assistance of Counsel for his defence."

U.S. Const. amend VI. By its terms, the amendment applies to the defendant in a criminal proceeding. However, sixth amendment guarantees, and the parameters of the compulsory process clause in particular, while not conferring constitutional safeguards upon witnesses, do inform this court's assessment of the relevance and need for the reporters' testimony under the three-pronged test which defines the privilege cited in *Miller,* 621 F.2d 721, 726. Thus, while not furnishing an independent ground for federal habeas corpus relief, sixth amendment considerations are integral to an analysis of the applicability of the constitutional privilege under the circumstances presented by the instant case, in order to make an accommodation between the reporters' qualified privilege under the first amendment and the defen-

dant's right to a fair trial under the sixth amendment. *See United States v. Valenzuela-Bernal,* 458 U.S. 858, 870, 102 S.Ct. 3440, 3448, 73 L.Ed.2d 1193 (1982).[2]

■ To establish a violation of the constitutional right to compulsory process, a criminal defendant must show that the testimony sought is both material and favorable to his defense. *United States v. Valenzuela-Bernal,* 458 U.S. 858, 867, 873, 102 S.Ct. 3440, 3446, 3449, 73 L.Ed.2d 1193. Moreover, that a defendant may not be able to detail the lost testimony because he was unable to interview witnesses does not relieve him of the duty to make some showing of materiality. *Id.* at 873, 102 S.Ct. at 3449.

■ The right to compulsory process under the sixth amendment is not absolute. It comprises the right to present testimony in one's favor before the trier of fact. It does not conceive the right to grant investigative services to or force interviews with defense counsel under the guise of a trial subpoena where no otherwise relevant or material testimony can be elicited or where the testimony would be cumulative. *See United States v. Fischel,* 686 F.2d 1082, 1092 (5th Cir.1982) (no right to interview a witness); *see also, Taylor v. Illinois,* 484 U.S. 400, 108 S.Ct. 646, 652, 98 L.Ed.2d 798 (1988); *Roussel v. Jeane,* 842 F.2d 1512, 1515–1516 (5th Cir.1988) (no right to cumulative testimony or to bolster credibility); *Ross v. Estelle,* 694 F.2d 1008, 1011 (5th Cir.1983) (no right to cumulative testimony).

■ Whether the compulsory process provision may be used to compel any citizen to talk with government or defense counsel off the witness stand, or to compel a citizen to remain in the courtroom in the hope that that citizen might recognize another court spectator is questionable at best. The right to compulsory process serves only to compel testimony before the trier of fact. *Taylor v. Illinois,* 108 S.Ct. at 652.

**2.** In *Valenzuela-Bernal,* the court cited *Roviaro v. United States,* 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957), which discussed balancing the government's interest in refusing disclosure

of an informer's identity and defendant's interest in material testimony. 458 U.S. 858, 870, 102 S.Ct. 3440, 3448, 73 L.Ed.2d 1193 (1982).

Even though this court believes the state district judge exceeded his authority in this respect, this does not raise a violation of petitioners' constitutional rights and hence does not afford petitioners an independent ground for habeas corpus relief.

■ With respect to petitioners' first amendment claims, a party seeking to overcome the reporters' qualified privilege must show that the information sought is relevant, that alternative means to obtain the information have been exhausted, and that there is a compelling interest in the information. *Miller v. Transamerican Press Inc.*, 621 F.2d at 726. The party who seeks to overcome the privilege bears the burden and must show that the test has been met by substantial evidence. *In re Selcraig*, 705 F.2d at 792.

■ No assertion was made or could be made that the petitioners were witnesses to the crime or had personally communicated with the defendant. Additionally, the petitioners had averred that they would not be able to recognize their sources, as the sources had been interviewed four months earlier for only ten minutes. The mere hunch that the petitioners may be able to identify persons present at a trial, who may supply the defendant with information that may be useful for impeachment purposes, is not a sufficient basis upon which to compel a witness' attendance in conformity with the compulsory process provision of the sixth amendment. *United States v. Valenzuela–Bernal*, 458 U.S. at 866–867, 102 S.Ct. at 3446.

■ The defendant, however, argued that the petitioners' testimony was necessary because it was exculpatory and could be useful for impeachment purposes. Prior to the seating of the jury or the taking of any testimony, the defense sought to have the petitioners view the persons in the court to determine whether present among them were their anonymous sources. As the defendant's attorneys had earlier indicated, they would require the petitioners to be on call to periodically survey the crowd and, if possible, identify their sources. However, the defendant did not show that exculpatory information was not forthcoming from other sources, such as the list of witnesses for the State, which had been furnished to the defense. Nor had the necessity for impeachment of a witness been shown. *Cf. United States v. Cuthbertson*, 651 F.2d 189, 195 (necessity for impeachment testimony was premature; and under Fed.R.Crim.Pro.Rule 17(c), "naked exculpatory material held by third parties that does not rise to the dignity of admissible evidence simply is not within the rule").

The defendant's asserted need for the information from the petitioners was based on a series of contingencies: if the reporters were able to recognize their sources, if those sources were called to testify, and if those sources were to give testimony which was otherwise inconsistent with the defense's theory of self defense then the petitioners would be called to impeach that testimony. Before either of these contingencies materialized, the petitioners were adjudged in contempt for refusing to disclose their sources.

In applying the three-pronged test to determine whether the qualified privilege was overcome by the plaintiff, the Court of Appeals for the Fifth Circuit in *In re Selcraig*, 705 F.2d 789, analyzed the case before it minutely, finding that the need for the evidence and the order compelling its production were premature. Similarly, this court believes that the state court's order in *State v. Taylor* to produce the information sought was premature.

Between the adjudication of contempt on February 5, 1991, and the sentencing on February 7, 1991, the defendant's need for the information became even more remote. On February 4, 1991, the defendant's court-appointed investigator interviewed the State's witnesses. On February 6, 1991, the state conceded that, according to the testimony, Percy Banyon, one of the decedents, was the aggressor. The testimony of at least five State's witnesses at the trial also indicated that Sanders was brandishing a bat threatening to strike at anyone who opposed his cousin, Banyon. Thus, in the closing hours of the trial, it became even more apparent that the evidence that was sought from petitioners, concerning the possible identity of sources who held a

belief as to who was the aggressor, was speculative, hearsay and cumulative.

Although the petitioners had no material and favorable evidence to offer, could not identify their sources, and indicated that the defense had access to other exculpatory testimony, the court insisted that the petitioners attempt to identify their sources and remain on call to attempt to identify other potential witnesses or sources whose statements might be used for impeachment purposes. This order was in excess of the mandate of the sixth amendment and required production of privileged information, which was already available and the compelling interest for which had not been shown.

While this court can conceive of other scenarios in which a reporter's qualified privilege to preserve confidential sources must yield to a defendant's rights to compulsory process and a fair trial, this is not such a case.

The adjudication of contempt is unconstitutional as a violation of the petitioners' qualified privilege under the first amendment. Accordingly, it is RECOMMENDED that the application for a writ of habeas corpus be GRANTED, and that Respondent, Johnny Klevenhagen be ORDERED to release the petitioners from his custody.