**UNITED STATES of America**

v.

**CUTHBERTSON, Gerald M., et al.**

**Appeal of CBS Inc., Third Party Witness.**

**No. 80–1325.**

United States Court of Appeals, Third Circuit.

Argued May 23, 1980.

Decided July 23, 1980.

Clyde A. Szuch (argued), Frederick L. Whitmer, Talbott Miller, Marc S. Klein, Pitney, Hardin & Kipp, Morristown, N. J., Ralph E. Goldberg, Allen Shaklan, Richard Altabef, New York City, for appellant.

John J. Barry (argued), Frohling, Fitzpatrick & Barry, Newark, N. J., for appellee Paul Gorrin.

Thomas W. Greelish (argued), Schenck, Price, Smith & King, Morristown, N. J., for appellee Gerald M. Cuthbertson.

Joseph T. Afflitto, William J. Martini, Passaic, N. J., Leonard Meyerson, Jersey City, N. J., John W. Noonan, Newark, N. J., of counsel, for appellees.

Robert J. Del Tufo, U.S. Atty., Robert S. Bonney, Jr., James A. Plaisted, Asst. U.S. Attys., Newark, N. J., for the U.S.

Floyd Abrams, Susan Fine, Cahill, Gordon & Reindel, New York City, Jay E. Berger, New York City, for amicus curiae NBC, Inc.

Before SEITZ, Chief Judge, and GIBBONS and ROSENN, Circuit Judges.

## OPINION OF THE COURT

SEITZ, Chief Judge.

CBS Inc. (CBS) appeals from an order of the district court adjudging it in civil contempt for failure to comply with a court order directing it to submit certain materials to the court prior to trial for in camera inspection.

### I.

On December 3, 1978, CBS broadcast an investigative report on its news program 60 MINUTES concerning the business of fast-food franchising. Entitled "From Burgers to Bankruptcy," the report focused on the activities of Wild Bill's Family Restaurants (Wild Bill's) and concluded with a statement by Mike Wallace that the FBI and the United States Attorney in Newark, New Jersey, had been investigating Wild Bill's and expected to present evidence to a grand jury in the near future.

On September 5, 1979, a grand jury in Newark returned an indictment against several principals of Wild Bill's (the defendants). The indictment charged the defendants with one count of conspiracy and nineteen counts of fraud arising out of the Wild Bill's franchising operation.

Approximately five months later, and less than one month before their trial was scheduled to begin, the defendants served CBS with a subpoena duces tecum asking CBS to produce before trial:

[I]nvestigator's notes regarding interviews with franchisees and employees of Wild Bill's, filmed interviews of such individuals which were not aired, which are called "out-takes" and notes pertaining to franchisees and employees who refused to be interviewed by your investigators, and, also all video tapes, audio tapes, notes, memoranda, reports and documents of any nature pertaining to the preparation of the program aired in December, 1978 entitled "From Burgers to Bankruptcy."

CBS moved to quash the subpoena, asserting a first amendment privilege for newsgathering that protected the requested materials.

The district court held a hearing on March 4, 1980, to consider the motion to quash. In an oral opinion issued at the end of this hearing, the district court ruled that the subpoena as written was overbroad and not enforceable under Fed.R.Crim.P. 17(c). However, because the defendants' trial was set to begin in one week, the court decided to confront CBS's privilege claim immediately instead of waiting for the trial. It based this decision on several factors, including a desire to avoid disrupting the trial and needlessly increasing its expense, and to afford an opportunity to obtain appellate review of the court's privilege decision before the start of the trial.

The district court relied on our recent decision in *Riley v. City of Chester*, 612 F.2d 708 (3d Cir. 1979), to find a qualified privilege protecting journalists in their newsgathering function. Because the privilege was not absolute, the court concluded that it must determine whether the privilege should yield to the defendants' need for the information sought. It also concluded that it could not make this determination without first seeing the information in CBS's possession. Therefore, the court directed the government to furnish CBS with a list of the witnesses it intended to call at trial. Instead of quashing the defendants' subpoena entirely on the basis of Fed.R.Crim.P. 17(c), the court modified it and ordered CBS to produce to the court for in camera inspection prior to trial all verbatim or substantially verbatim statements in CBS's possession made by persons named in the witness list.

The court's order did not provide for the release of any of these statements to the defendants before the trial. Rather, the court stated that it would entertain a motion by the defendants for disclosure of such statements after each witness in question testified on direct examination at trial. Only then would the court balance the defendants' need for the statements against the interests underlying the privilege. After so ruling, the court gave CBS until March 6 to decide whether to comply with the subpoena as modified.

After the March 4 hearing, the defendants served CBS with a second subpoena. This subpoena sought production directly to the defendants of all verbatim or substantially verbatim statements relating or referring to Wild Bill's made by roughly 100 named persons. The great majority of these persons were franchisees or potential franchisees of Wild Bill's and former employees of Wild Bill's. Although it appears that there is some overlap between the persons included in this subpoena and in the government's witness list, we cannot determine from the record the extent of the overlap.

At a hearing held on March 6, the district court also denied enforcement of this subpoena. Because it previously had held that a qualified journalist's privilege protected the type of material sought by this subpoena, the court concluded that direct production of these statements to the defendants was improper. It modified this subpoena to conform to its March 4 ruling and directed CBS to produce to the court for in camera review prior to trial all verbatim and substantially verbatim statements made by the franchisees and potential franchisees listed in the second subpoena. The court did not order production of the statements of Wild Bill's employees or the other persons named in the subpoena and did not specify a procedure for production of the franchisees' statements to the defendants at trial.

The court incorporated this ruling into its March 4 order. The result required CBS to give to the court for in camera inspection all film and audio tapes or written transcripts that reproduced any verbatim or substantially verbatim statements made by: 1) any individuals named in the witness list, and 2) the franchisees or potential franchisees named in the second subpoena.

CBS, however, informed the court that it would not comply with this production order. Therefore, the court held CBS in civil contempt and imposed a fine of $1 per day for every day that CBS remained in contempt. This court thereafter granted a stay pending disposition of this appeal.

CBS attacks the contempt citation on two grounds. First, it argues that the defendants' subpoenas, even as modified by the district court, did not satisfy the requirements of Fed.R.Crim.P. 17(c). Second, it asserts that the material the district court ordered it to produce is protected by a qualified first amendment privilege not to disclose unpublished information and that the district court did not give proper weight to this privilege when it ordered production for in camera review.

## II.

Fed.R.Crim.P. 17 governs the use of subpoenas in criminal cases. Subsection (c) of that rule covers subpoenas of documentary evidence and provides that:

> A subpoena may also command the person to whom it is directed to produce the books, papers, documents or other objects designated therein. The court on motion made promptly may quash or modify the subpoena if compliance would be unreasonable or oppressive. The court may direct that books, papers, documents or objects designated in the subpoena be produced before the court at a time prior to the trial or prior to the time when they are to be offered in evidence and may upon their production permit [them] to be inspected by the parties and their attorneys.

We will assume for purposes of this appeal that the rule permits the district court to require production of material to the court prior to trial without also allowing the party seeking production to inspect the material pretrial. CBS does not argue otherwise. In analyzing CBS's rule 17(c) argument, it is helpful to consider the two subpoenas involved in this case separately.

## A.

■ CBS contends that the district court's modification of defendants' first subpoena, which ordered CBS to produce to the court certain statements of witnesses the government intends to call at trial, required production broader than that permitted by rule 17(c). In *Bowman Dairy Co. v.*

*United States,* 341 U.S. 214, 71 S.Ct. 675, 95 L.Ed. 879 (1951), the Supreme Court identified the scope of material that is subject to subpoena under the rule. The Court stated that the rule was not intended to provide a means of discovery in addition to that provided by Fed.R.Crim.P. 16. However, it held that "any document or other materials, admissible as evidence" is subject to subpoena under the rule. *Id.* at 221, 71 S.Ct. at 679. Thus, rule 17(c) is designed as an aid for obtaining relevant evidentiary material that the moving party may use at trial. *See, e.g., United States v. Malizia,* 154 F.Supp. 511, 513 (S.D.N.Y.1957). The test for enforcement is whether the subpoena constitutes a good faith effort to obtain identified evidence rather than a general "fishing expedition" that attempts to use the rule as a discovery device. *See Bowman Dairy Co. v. United States, supra,* 341 U.S. at 220–21, 71 S.Ct. at 678–79; *United States v. Liddy,* 354 F.Supp. 208 (D.D.C. 1972); *United States v. Wortman,* 26 F.R.D. 183 (E.D.Ill.1960).

■ Under the "evidentiary" standard of *Bowman,* rule 17(c) permits a party to subpoena materials that may be used for impeaching a witness called by the opposing party, including prior statements of the witness. *See, e. g., United States v. Liddy, supra; United States v. Carter,* 15 F.R.D. 367 (D.D.C.1954). In the present case, the district court found that verbatim and substantially verbatim statements of government witnesses held by CBS would be relevant to those witnesses' credibility.

■ However, because such statements ripen into evidentiary material for purposes of impeachment only if and when the witness testifies at trial, impeachment statements, although subject to subpoena under rule 17(c), generally are not subject to production and inspection by the moving party prior to trial. *See United States v. Nixon,* 418 U.S. 683, 701, 94 S.Ct. 3090, 3104, 41 L.Ed.2d 1039 (1974); *United States v. Rothman,* 179 F.Supp. 935 (W.D.Pa.1959). Here, the district court quashed the defendants' first subpoena to the extent that it sought

pretrial production and inspection by the defendants of these statements. Under the district court's order, the defendants will get such statements, if at all, only after the witness testifies at trial.

■ CBS nevertheless argues that the district court's order requiring production of these statements *to the court* before trial was improper. The fact that requested material may be evidentiary and subject to subpoena at trial under *Bowman* does not mean that the party seeking production is automatically entitled to pretrial production and inspection. To obtain these rights prior to the trial, a party must show:

> (1) that the documents are evidentiary and relevant; (2) that they are not otherwise procurable reasonably in advance of trial by exercise of due diligence; (3) that the party cannot properly prepare for trial without such production and inspection in advance of trial and that the failure to obtain such inspection may tend unreasonably to delay the trial; and (4) that the application is made in good faith and is not intended as a general "fishing expedition."

*United States v. Nixon*, 418 U.S. 683, 699–700, 94 S.Ct. 3090, 3103, 41 L.Ed.2d 1039 (1974) (footnote omitted) (citing *United States v. Iozia*, 13 F.R.D. 335, 338 (S.D.N.Y. 1952)).

■ CBS contends that the district court erroneously ordered pretrial production of statements to the court under the first subpoena because the defendants have not satisfied the test set forth in *Nixon.* In both *Nixon* and *Iozia*, however, the courts applied this test to determine whether to enforce a subpoena seeking both production and inspection by the moving party prior to trial. The concerns underlying the second and third elements of this test simply are not applicable when only production to court, rather than to the moving party, is involved. We do not think that the *Nixon* test applies where, as here, the district court has modified the subpoena to preclude any pretrial production to or inspection by the moving party.

■ Decisions regarding the quashing or modification of rule 17 subpoenas are committed to the district court's discretion. *See United States v. Nixon, supra*, 418 U.S. at 702, 94 S.Ct. at 3104. The record makes clear that the district court authorized pretrial production for in camera review in this case to aid its preparation for ruling on whether these statements will be produced to the defendants at trial—an attempt to avoid unnecessary delay and disruption of the trial. Given that these statements of potential government witnesses are otherwise subject to subpoena at trial under rule 17(c), we cannot say that the district court abused its discretion under the rule in requiring pretrial production to the court to expedite its trial decisions.

### B.

We now turn to the second subpoena issued to CBS. The district court modified this subpoena to require production to the court of all verbatim and substantially verbatim statements in the possession of CBS made by franchisees and potential franchisees who allegedly were victims of fraud perpetrated by the defendants.

Although the district court's modification of the second subpoena was similar to its modification of defendants' initial subpoena in that it requires production to the court only of verbatim and substantially verbatim statements, there is one crucial difference between them. Unlike the first subpoena, the production ordered under this subpoena is not limited to witnesses the government intends to call at trial. While there probably is some overlap between the government's witness list and the list of franchisees and potential franchisees, the second subpoena orders the production of statements made by some individuals who will not be called as witnesses for the government at trial.

As we noted above, only evidentiary material is subject to subpoena under rule 17(c). Unlike the statements covered by the modification of the first subpoena, statements made by nonwitnesses have no value as possible prior inconsistent state-

ments to impeach trial testimony. The defendants have presented no other evidentiary use for such statements at trial, except for a general assertion that this material might contain exculpatory information.

■ At oral argument before the district court, counsel for the defendants admitted that they did not know whether the statements of the franchisees and potential franchisees contained any exculpatory information. Thus, the defendants' broad request, which was only slightly limited by the district court, was based solely on the mere hope that some exculpatory material might turn up. We do not think that this "mere hope" justifies enforcement of a subpoena under rule 17(c). *See Gilmore v. United States*, 256 F.2d 565, 568 (2d Cir. 1958); *United States v. Maloney*, 37 F.R.D. 441, 445 (W.D.Pa.1965).

■ Courts must be careful that rule 17(c) is not turned into a broad discovery device, thereby undercutting the strict limitation of discovery in criminal cases found in Fed.R.Crim.P. 16. The second subpoena involved in this case, even as modified by the district court, constituted a broad request for material in CBS's possession on a very slight showing of the evidentiary nature of the material sought. We conclude that this subpoena should have been quashed under rule 17(c) and that the part of the district court's order requiring production of statements under the second subpoena constituted an abuse of discretion. Therefore, we will reverse the contempt citation of CBS to the extent it was based on CBS's refusal to produce the material covered by the modification of the second subpoena.

### III.

CBS contests its contempt citation on a second ground. It argues that the material the district court ordered it to produce is protected by a first amendment qualified privilege not to disclose unpublished information and that the defendants have not shown sufficient need for this material to justify even production for in camera review as ordered by the district court. Given our rule 17(c) holdings, we need consider CBS's privilege contentions only as they relate to that part of the contempt citation based on CBS's failure to produce statements of witnesses the government intends to call at trial.

### A.

The defendants initially assert that the privilege relied on by CBS does not exist. However, in our recent decision in *Riley v. City of Chester*, 612 F.2d 708 (3d Cir. 1979), we held that journalists have a federal common-law qualified privilege arising under Fed.R.Evid. 501 to refuse to divulge their confidential sources. This holding was based, in part, on the strong public policy supporting the unfettered communication to the public of information and opinion, a policy we found to be grounded in the first amendment. We also found support for this privilege in *Branzburg v. Hayes*, 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972), where the Supreme Court acknowledged the existence of first amendment protection for newsgathering. *See* 612 F.2d at 714–15.[1]

*Riley* was a civil action brought under 42 U.S.C. § 1983 (1976). The defendants argue that the privilege recognized in *Riley* is inapplicable in a criminal case because of the criminal defendant's sixth amendment rights to compulsory process and to confront witnesses against him and his due process right to a fair trial. We disagree. Although *Riley* did not consider the existence of a qualified privilege in a criminal case, *see* 612 F.2d at 716, we find it to be persuasive authority in this case.

---

1. In addition, we found an independent and congruent basis of authority for the privilege in the Pennsylvania shield law. *See* 612 F.2d at 715. New Jersey recently has enacted a comprehensive shield law that creates a qualified journalists' privilege to refuse to disclose their sources and any news or information obtained in the course of professional activities, whether such information is disseminated or not. *See* P.L.1979, ch. 479 (effective 2/27/80) *codified at* N.J.Stat.Ann. § 2A:84A-21.1 to –21.8 (West 1980 Session Laws).

First, the interests of the press that form the foundation for the privilege are not diminished because the nature of the underlying proceeding out of which the request for the information arises is a criminal trial. CBS's interest in protecting confidential sources, preventing intrusion into the editorial process, and avoiding the possibility of self-censorship created by compelled disclosure of sources and unpublished notes does not change because a case is civil or criminal.

Moreover, acceptance of defendants' view that their constitutional interests in a criminal trial preclude the existence of a journalists' privilege in criminal cases would amount to a finding that these interests always prevail over the first amendment interests underlying that privilege. However, in *Nebraska Press Association v. Stuart*, 427 U.S. 539, 561, 96 S.Ct. 2791, 2803, 49 L.Ed.2d 683 (1976), the Supreme Court stated that:

> The authors of the Bill of Rights did not undertake to assign priorities as between First Amendment and Sixth Amendment rights, ranking one as superior to the other. . . . [I]f the authors of these guarantees, fully aware of the potential conflicts between them, were unwilling or unable to resolve the issue by assigning to one priority over the other, it is not for us to rewrite the Constitution by undertaking what they declined to do.

A defendant's sixth amendment and due process rights certainly are not irrelevant when a journalists' privilege is asserted. But rather than affecting the existence of the qualified privilege, we think that these rights are important factors that must be considered in deciding whether, in the circumstances of an individual case, the privilege must yield to the defendant's need for the information.

The privilege recognized in *Riley* involved only protection of confidential sources. In this case, the government has obtained waivers from all of its witnesses permitting disclosure of their statements held by CBS. CBS asserts, however, that the privilege also protects unpublished material held by it regardless of the confidentiality of the source.

We do not think that the privilege can be limited solely to protection of sources. The compelled production of a reporter's resource materials can constitute a significant intrusion into the newsgathering and editorial processes. *See Loadholtz v. Fields*, 389 F.Supp. 1299, 1303 (M.D.Fla. 1975). Like the compelled disclosure of confidential sources, it may substantially undercut the public policy favoring the free flow of information to the public that is the foundation for the privilege. *See Riley v. City of Chester, supra.* Therefore, we hold that the privilege extends to unpublished materials in the possession of CBS. *See Altemose Construction Co. v. Building & Construction Trades Council*, 443 F.Supp. 489, 491 (E.D.Pa.1977) ("this qualified privilege can even apply when the news source and, perhaps, a portion of the withheld writing, are not confidential"). Of course, the lack of a confidential source may be an important element in balancing the defendant's need for the material sought against the interest of the journalist in preventing production in a particular case.

Nor does the fact that the government has obtained waivers from its witnesses waive the privilege. The privilege belongs to CBS, not the potential witnesses, and it may be waived only by its holder. *Cf. Republic Gear Co. v. Borg–Warner Corp.*, 381 F.2d 551 (2d Cir. 1967) (attorney-client privilege may be waived only by the client, the holder of the privilege); *Perrignon v. Berger Brunswig Corp.*, 77 F.R.D. 455 (N.D.Cal.1978) (same).

In summary, we hold that journalists possess a qualified privilege not to divulge confidential sources and not to disclose unpublished information in their possession in criminal cases. We note that this holding is consistent with many cases that have recognized such a privilege in criminal cases. *See, e. g., Farr v. Pitchess*, 522 F.2d 464 (9th Cir. 1975), *cert. denied*, 427 U.S. 912, 96 S.Ct. 3200, 49 L.Ed.2d 1203 (1976);

*United States v. Hubbard*, 493 F.Supp. 202 (D.D.C.1979); *Commonwealth v. Brown*, 214 Va. 755, 204 S.E.2d 429, *cert. denied*, 419 U.S. 966, 95 S.Ct. 229, 42 L.Ed.2d 182 (1974). *But see United States v. Liddy*, 354 F.Supp. 208 (D.D.C.1972).

B.

Because the privilege is qualified, there may be countervailing interests that will require it to yield in a particular case, *Riley v. City of Chester*, 612 F.2d 708, 715 (3d Cir. 1979), and the district court must balance the defendant's need for the material against the interests underlying the privilege to make this determination. The district court has not yet made this balancing decision in the present case, and we need not determine the precise factors the district court should consider and how it should weigh them in making its decision. The only issue confronting us is whether the district court properly ordered production for in camera review to facilitate this balancing process at trial.

On appeal, CBS does not contend that in camera review is an improper method for the district court to use in making this privilege decision. However, it argues that even in camera review inhibits the journalist's exercise of rights protected by the first amendment and that the privilege prohibits such review absent a preliminary showing of need by the defendants. *See New York Times Co. v. Jascalevich*, 439 U.S. 1331, 99 S.Ct. 11, 58 L.Ed.2d 38 (1978) (Marshall, J., in chambers). In particular, CBS contends that the court may not order production of privileged material for in camera review unless the defendants have shown both that they cannot obtain the material from another source without implicating first amendment values and that the material is "centrally relevant" to preparation of their defense.

■ We agree with CBS that an order for production of privileged materials for in camera review may not be based solely on the defendants' request for the material. If the material is available from a nonjournalistic source, the defendants can obtain the information they seek without intruding on the first amendment interests of CBS. In this situation, both the defendants' need for the information and CBS's first amendment interests are satisfied. Therefore, the district court should not be required to make the delicate balance of interests required by the privilege unless the defendant first shows that he is unable to acquire the information from another source that does not enjoy the protection of the privilege.

■ Given our rule 17(c) holding, the only material we are concerned with in this case is the verbatim and substantially verbatim statements held by CBS of witnesses that the government intends to call at trial. By their very nature, these statements are not obtainable from any other source. They are unique bits of evidence that are frozen at a particular place and time. Even if the defendants attempted to interview all of the government witnesses and the witnesses cooperated with them, the defendants would not obtain the particular statements that may be useful for impeachment purposes at trial. Thus, we think that the defendants have met their burden of establishing that the information that the district court ordered produced for in camera review is not available from another, unprivileged source.

CBS also suggests that in camera production is improper unless the defendants show that the witnesses' statements are "centrally relevant" to their defense. We already have held that the modification of defendants' first subpoena satisfied rule 17(c), which limits subpoenas duces tecum in criminal cases to relevant evidentiary material. We think that a defendant has made a sufficient showing to justify production of privileged material to the court for in camera review if his subpoena complies with rule 17(c) and if he establishes that the information sought is not available from another source. Because both conditions are satisfied for the modification of the first subpoena in this case, we conclude that the part of the district court's production order requiring CBS to produce the witness-

es' statements for in camera review was consistent with the privilege. We need not decide, however, whether any additional showing must be made by the defendants to overcome the privilege and to compel production of these statements to them at trial.

IV.

We will affirm CBS's contempt citation to the extent that it is based on CBS's failure to produce for in camera review by the court statements in its possession made by persons on the government's witness list. Insofar as the contempt order is predicated on production of statements of nonwitnesses, it will be reversed.

Each party shall bear its own costs.