**In re SCOTT PAPER COMPANY SECURITIES LITIGATION.**

**This Document Relates to All Actions**

**No. 90–6192.**

United States District Court, E.D. Pennsylvania.

Nov. 30, 1992.

Reconsideration Denied Jan. 8, 1993.

Robert P. Frutkin, Berger & Montague, P.C., Gerald J. Rodos, Barrack, Rodos & Bacine, Philadelphia, PA, Nicholas E. Chimicles, Miles B. Rittmaster, Denise Davis Schwartzman, Greenfield & Chimicles, Haverford, PA, Dianne M. Nast, Stuart Savett, Barbara A. Podell, Kohn, Savett, Klein and Graf, P.C., Sherrie R. Savett, Philadelphia, PA, for plaintiffs.

Donald A. Scott, Morgan, Lewis & Bockius, Patrick W. Kittredge, Philadelphia, PA, for defendants Scott Paper Co., Philip E. Lippincott and Ashok N. Bakhrv.

Dean Ringel, Cahill, Gordon & Reindel, New York City, for respondent Standard & Poor's Corp.

## MEMORANDUM

BARTLE, District Judge.

This consolidated class action involves allegations of securities fraud against defendant Scott Paper Company ("Scott"). Plaintiffs claim that Scott made false and misleading representations concerning its operations, financial condition and future business prospects. In particular, plaintiffs allege that Scott made optimistic earnings projections which were without a reasonable basis, and are thus actionable misrepresentations under *Virginia Bankshares, Inc. v. Sandberg,* 501 U.S. ——, 111 S.Ct. 2749, 115 L.Ed.2d 929 (1991). Before the court is the motion of plaintiffs to compel discovery from Standard & Poor's Corporation ("S & P"), a non-party. S & P opposes the motion, asserting that it is protected by a qualified journalist's privilege.

S & P rates and comments on the creditworthiness of public companies and their securities and disseminates that information to the public through its several periodicals. During the class period, S & P met and corresponded with employees of Scott in order to rate the creditworthiness of Scott's debt securities. Plaintiffs assert that the information Scott provided to S & P will reflect whether Scott had a reasonable basis for its positive predictions. Plaintiffs seek discovery of documents which S & P obtained from Scott, as well as notes and other unpublished documents reflecting communications between S & P and Scott, and information about S & P's internal procedures and deliberative processes.[1] Plaintiffs also seek to depose an S & P employee who was present at a meeting with Scott personnel.

---

1. These requests are found in ¶¶ 4, 7 and 8 of the plaintiff's document request. In ¶ 4, for example, plaintiffs seek "all documents relating to Scott prepared by [S & P] ...", "all reports made internally, issued to Scott and/or made publicly by [S & P] concerning Scott ..." Similarly ¶ 8 requests, "[a]ll documents referring or relating to the rating or review of any rating of Scott ..."

■ Plaintiffs' request for the internal operating procedures and deliberations of S & P is without merit. Under Rule 26(b) of the Federal Rules of Civil Procedure, "[p]arties may obtain discovery regarding any matter, not privileged, which is *relevant to the subject matter* involved in the pending action ..." (emphasis added). The rule casts a wide net allowing discovery of all relevant material regardless of its admissibility at trial so long as "the information sought appears reasonably calculated to lead to the discovery of admissible evidence." *Id.* The scope of permissible discovery is not, however, without its limits. The information sought must be somehow relevant to the case. Information about S & P's internal procedures and deliberations bears no demonstrable relevance to plaintiffs' case. S & P is a not a party to this action, nor is any rating or analysis of S & P a subject of the litigation. Plaintiffs seek discovery from S & P in order to determine what Scott personnel knew about Scott's financial condition and prospects. S & P's own use or interpretation of that information has no bearing on this issue. Therefore, as to all information relating to S & P internal procedures and deliberations, the plaintiffs' motion to compel will be denied.

■ In contrast, plaintiffs' requests for notes and other documents containing information about S & P's interviews and communications with Scott appear to be relevant to the issues in the case. Absent a privilege, they are subject to disclosure under Rule 26(b). The court must, therefore, decide whether a journalist's privilege protects S & P. from discovery.

The First Amendment to the Constitution provides that "Congress shall make no law ... abridging the freedom ... of the press ..." The free press clause was designed to "preserve an untrammeled press as a vital source of public information," *Grosjean v. American Press Co.*, 297 U.S. 233, 250, 56 S.Ct. 444, 449, 80 L.Ed. 660 (1936). In *Branzburg v. Hayes*, 408 U.S. 665, 707, 92 S.Ct. 2646, 2670, 33 L.Ed.2d 626 (1972), the Supreme Court recognized that the First Amendment afforded some protection for the process of news gathering, explaining that "without some protection for seeking out the news, freedom of the press could be eviscerated." As a result, the Court of Appeals of this circuit has recognized a qualified privilege for journalists to protect confidential sources in order to preserve the journalist's ability to obtain information. *Riley v. City of Chester*, 612 F.2d 708, 714 (3d Cir.1979). The court explained that the privilege is necessary to effectuate the "strong public policy which supports the unfettered communication to the public of information, comment and opinion." In *United States v. Cuthbertson*, 630 F.2d 139, 146 (3d Cir.1980), *cert. denied*, 449 U.S. 1126, 101 S.Ct. 945, 67 L.Ed.2d 113 (1981) the court extended the privilege to protect a reporter's notes and other unpublished information, finding that compelled disclosure of such material would impede the news gathering and editorial processes, and threaten the "free flow of information which is the foundation for the privilege." *Id.* at 147.

Plaintiffs assert that S & P is "not a member of the traditional news gathering and information disseminating community" (Plaintiffs' Brief at 4), and therefore is not entitled to assert the journalist's privilege. As stated above, S & P rates the creditworthiness of public companies and their securities. S & P publishes its ratings and other financial information and analysis in several periodicals.[2] While issuers of securities pay a fee for S & P's rating services, S & P does not charge a fee for publication

---

**2.** S & P publishes *CreditWeek* which not only provides a review of S & P's various ratings but also analyzes other developments in the credit market; *Bond Guide,* a monthly listing of corporate debt issue ratings; *Commercial Paper Ratings Guide,* a monthly compilation of commercial paper ratings and ratings rationales; *S & P's High Yield quarterly,* which reports on the developments in the high yield bond market and provides corporate credit analysis, *Municipal Bond Book,* a bi-monthly guide to municipal bonds, notes, commercial paper and industrial revenue bonds, and *The Ratings Handbook,* a monthly comprehensive list of all corporate ratings.

of the ratings.[3] Furthermore, S & P maintains editorial control over the form and content of its publications and over the decision whether to publish any particular rating. S & P bases its ratings on financial projections provided by the issuer, combined with its own independent research and analysis. Although the identity of issuers which provide S & P with information are known to the public, S & P does not disclose the information provided except to the extent it incorporates such information in its published analysis. S & P asserts that compulsory disclosure of this material will stem the flow of sensitive information from the issuers and inhibit the deliberative and editorial process.

Few cases provide any guidance about what it means to be a member of the press for First Amendment purposes. As a threshold matter, we see no reason why disseminators of corporate financial information should not have as strong a claim to First Amendment protection as do disseminators of other kinds of information. The value to society of financial reporting and analysis is beyond question. In *Lovell v. City of Griffin*, 303 U.S. 444, 451, 58 S.Ct. 666, 669, 82 L.Ed. 949 (1938) the court emphasized the broad sweep of the First Amendment's protection of the press, stating "[t]he press in its historic connotation comprehends every sort of publication which affords a vehicle of information and opinion." It includes not only large metropolitan newspapers and professional journalists but individual pamphleteers, and lone documentary film makers. *See Lovell*, 303 U.S. at 451, 58 S.Ct. at 669; *Silkwood v. Kerr–McGee Corp.*, 563 F.2d 433 (10th Cir.1977). Furthermore, it is not confined to any particular subject matter. Economic and scientific information, for example, has as great a claim to First Amendment protection as does political discourse.

While any definition of the press must be broad, it is not without limitation. Advertisements, for example, provide "a vehicle of information and opinion"; yet, the Supreme Court has held that commercial speech is only afforded limited First Amendment protection. *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council*, 425 U.S. 748, 771–72 n. 24, 96 S.Ct. 1817, 1830 n. 24, 48 L.Ed.2d 346 (1976). Thus, not every publication which purports to disclose information automatically qualifies as the press with full First Amendment protection.

In support of their claim that S & P is merely a rating agency, and not a member of the press, plaintiffs point to the fact that issuers pay S & P for its rating services, and that the entities rated have a strong economic interest in voluntarily disclosing information to S & P. Plaintiffs suggest that S & P is therefore akin to an accountant or financial advisor and is thus not entitled to assert a journalist's privilege. We reject this analogy. Unlike an accountant or an individual's financial advisor, S & P, at its discretion, publishes its conclusions in its periodicals for the benefit of the general public. Moreover, the fact that S & P's sources have an interest, economic or otherwise, in disclosing information to S & P is irrelevant to the question of whether S & P is a member of the press. Informants in many situations have an interest in telling their stories to the press. Political candidates, for example, seek out opportunities to make headlines and thus publicize their names and causes. Issuers seeking to make their stocks and bonds more marketable by having them analyzed in S & P's publications are no different.

We have found no case, and the parties have cited none, which analyzes whether S & P or similar organizations constitute the press under the First Amendment. Nonetheless, the Supreme Court's decision in *Lowe v. SEC*, 472 U.S. 181, 105 S.Ct. 2557, 86 L.Ed.2d 130 (1985) is instructive. There the Supreme Court considered, but declined

---

**3.** The inside cover of *Creditweek* contains a disclaimer by S & P stating:

S & P receives compensation for rating obligations. Such compensation is based on the time and effort to determine the rating and is normally paid either by the issuers of such securities or by the underwriters participating in the distribution thereof. The fees generally vary from $2,500 to $50,000. While S & P reserves the right to disseminate the rating, it receives no payment for doing so, except for subscriptions to its publications.

to determine, whether investment newsletters fell within the definition of the press for First Amendment purposes. The majority of the court, as a matter of statutory interpretation, held that an investment newsletter was not subject to regulation by the Securities and Exchange Commission under the Investment Advisor's Act of 1940 and thus avoided the First Amendment issue. Chief Justice Burger, Justice Rehnquist, and Justice White concurred. They would have reached the constitutional issue and declared that such a newsletter was protected by the free press clause of the Constitution. Both the majority and concurring justices took pains to distinguish between investment newsletters designed for and disseminated to the public and communications or letters tailored to an individual investor's special needs. We believe that the Supreme Court would be likely to hold, if squarely faced with the issue, that the investment newsletters involved there would also be protected by the free press clause of the First Amendment.

In this case, whatever the definitional limits of the press for First Amendment purposes, S & P falls within its umbrella of protection. S & P's publications have all the attributes identified by the Supreme Court in *Lowe* as indicative of the press. S & P publishes periodicals with a regular circulation to a general population. Although issuers may pay for its rating services, S & P does not merely publish what the issuer desires as it would with advertisements. In contrast, S & P makes its own analysis, designed not merely for the personal use of the rated companies, but for the benefit of all who might read its publications. S & P maintains complete editorial control over the form and content of its publications, and the issuers who pay to be rated have no voice in the decision of which ratings to publish. Furthermore, unlike stockbrokers or personal investment advisors, S & P does not advise specific clients on their purchases or sales and has no personal interest in whether its subscribers actually purchase the securities which it rates. Regardless of the nature of S & P's sources, the fact remains that S & P publishes information for the benefit of the general public.

The determination that S & P is entitled to the protection afforded the press under the First Amendment does not conclude the inquiry. The journalist privilege is a qualified one, and the court must determine its applicability to the facts of this case. In *Riley v. City of Chester*, 612 F.2d at 717, the Court of Appeals of this circuit held that the privilege could be overcome but only on a showing by the party seeking discovery that he or she has "exhausted other means of obtaining the information" and that the material sought 'provide[s] a source of crucial information going to the heart of the [claim] [sic].' In *United States v. Cuthbertson*, 630 F.2d at 146, the court reiterated the qualified nature of the privilege. It stated that "the district court must balance the defendant's need for the material against the interests underlying the privilege." *Id.* at 148. Furthermore, the court specifically noted that the lack of a confidential source "may be an important element in balancing the defendant's need for the material sought against the interest of the journalist in preventing production in a particular case." *Id.* at 147. Thus, under *Riley* and *Cuthbertson*, the determination is highly fact specific. We must evaluate the moving party's need for the information against the possible harm to the First Amendment interests at stake.

The extent of the "source's" interest in providing information to S & P, like the fact that S & P's sources are not confidential, is relevant in determining the extent of the burden on First Amendment interests. In *Virginia State Board of Pharmacy*, 425 U.S. at 768, 96 S.Ct. at 1829, the Supreme Court concluded that commercial speech could be more heavily regulated than other types of speech, in part because a company's strong interest in advertising suggested that "there is little likelihood of [commercial speech] being chilled by proper regulation and foregone entirely." While commercial speech is not implicated here, the importance of S & P's ratings to an issuer's ability to market its commercial paper and debt instruments suggests that

the possibility of disclosure may not chill the continued flow of financial information. The possibility of disclosure may, however, affect the candor with which such company's representatives are willing to speak with organizations like S & P. In any case, while the danger to the First Amendment here may be less than in other situations, plaintiffs have not met their initial burden of establishing an overriding need for the material requested.

First, plaintiffs have not demonstrated that the documents provided by Scott to S & P are unavailable elsewhere. Plaintiffs state that Scott personnel cannot identify all of the documents that they may have sent to S & P. S & P however has expressed its willingness to provide plaintiffs with a list of such documents and to provide plaintiffs with any documents which Scott itself is unable to produce. This is an equitable solution which adequately addresses plaintiffs' need for the information.

As to S & P's unpublished notes and other documents reflecting information provided by Scott, plaintiffs assert that this information is unavailable because Scott personnel cannot recall exactly what was said to S & P. Nonetheless, we find that plaintiffs have not met their burden of demonstrating that they have exhausted other means of obtaining the information and that the material sought is crucial to the case such that compelling First Amendment interests should be overcome. According to plaintiffs' affidavits, Scott personnel had one meeting with S & P, at which Scott made a presentation concerning the rating of its bonds. All other communication between Scott and S & P was accomplished by way of written documents. Plaintiffs' exhibits further demonstrate that the contents of this presentation were reflected in documents Scott prepared for the meeting. Plaintiffs have not shown that they are unable to obtain these documents, or that they will be inadequate substitutes for the discovery sought from S & P. It is possible that Scott personnel made relevant disclosures at the meeting which are not reflected in any of Scott's documents or in S & P's published analysis. The mere possibility of helpful information,

however, is not a sufficiently strong showing of need to justify the great intrusion into the deliberative and editorial process of the press which disclosure of the requested material would cause.

Finally, because plaintiffs will not be permitted any discovery concerning S & P's internal procedures or analysis, or concerning information provided by Scott other than what is reflected in Scott's documents, plaintiffs' request for the deposition of an S & P representative will be denied.

## MEMORANDUM ON RECONSIDERATION

This consolidated class action involves allegations of securities fraud against defendant Scott Paper Company ("Scott"). Plaintiffs claim that Scott made false and misleading representations concerning its operations, financial condition and future business prospects. In particular, plaintiffs allege that Scott made optimistic earnings projections which were without a reasonable basis, and are thus actionable misrepresentations under *Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. ——, 111 S.Ct. 2749, 115 L.Ed.2d 929 (1991).

■ On November 30, 1992, this Court denied plaintiffs' motion to compel discovery from Standard & Poor's Corporation ("S & P"). We held that S & P is a member of the press entitled to assert a qualified journalist's privilege against compelled discovery. We further held that plaintiffs did not meet their burden of showing an overriding need for the information sought. Before the Court is plaintiffs' motion for reconsideration of that decision or, in the alternative, to allow the deposition of Basil Anderson, Scott's primary contact with S & P.

S & P rates and comments on the creditworthiness of public companies and their securities and disseminates that information to the public through its several periodicals. During the class period, S & P was in contact with employees of Scott in order to rate the creditworthiness of Scott's debt securities. Plaintiffs do not now contest that S & P is a member of the press, entitled to assert the privilege. In-

stead, plaintiffs assert that their need for the information should overcome the privilege. In *Riley v. City of Chester*, 612 F.2d 708, 717 (3d Cir.1979), the Court of Appeals of this circuit held that the privilege could be overcome but only on a showing by the party seeking discovery that he or she has "exhausted other means of obtaining the information" and that the material sought 'provide[s] a source of crucial information going to the heart of the [claim] [sic].' *Riley*, 612 F.2d at 714. Plaintiffs have not met this burden.

Because S & P has volunteered to provide all written documents provided to it by Scott, only the oral communications between Scott and S & P are at issue here. Plaintiffs do not contend that investors were misled by the information provided to S & P. Rather, plaintiffs assert that the information communicated to S & P will indicate what Scott personnel knew about Scott's internal operations and financial prospects.

In support of their position, plaintiffs point to documentation which suggests that Scott personnel may have orally told S & P something that was inconsistent with the documentation they provided. Furthermore, plaintiffs state that these oral communications are unavailable from Scott because this Court previously disallowed the deposition of Basil Anderson ("Anderson"), Scott's main contact with S & P. While the requested information may be unavailable from sources other than S & P, that alone is not enough to overcome the privilege. Plaintiffs must show both that the information is unavailable *and* that it goes "to the heart" of plaintiffs' case. *Riley*, 612 F.2d at 714. Information about what Scott knew was available from Scott itself. In fact, plaintiffs have already obtained voluminous documentation from Scott and have taken the depositions of ten of Scott's senior managers. Although it is possible that some additional piece of information about Scott's internal knowledge might be gleaned from the discovery sought from S & P, this Court has already held that the mere possibility of such information is not enough to overcome the important First Amendment issues at stake.

Finally, plaintiffs' request for the deposition of Anderson will also be denied. This Court has attempted to control the potentially endless discovery which often accompanies large securities fraud cases by placing realistic limits on the number of depositions which the plaintiffs may take. Although plaintiffs now claim that Anderson's information is crucial, they did not request the right to take his deposition at the time they filed their original motion to compel discovery from S & P. As explained above, plaintiffs want to depose him in order to determine what Scott told S & P. In light of the extensive discovery in this case, we do not believe that such information is crucial, so as to permit an added deposition now that discovery is closed.

Accordingly, plaintiffs' motion for reconsideration of this Court's Order of November 30, 1992 or, in the alternative, to allow the deposition of Basil Anderson, will be denied.