GREGG COSTA, Circuit Judge, dissenting:
The first step an appellate court is supposed to take in a case is reviewing the same materials the trial court considered. Only after that can it decide if that judge erred. In a stark departure from that norm, the majority opinion finds that the district court didn't just err but abused its discretion in balancing discovery factors without looking at the most critical part of the trial court record: the in camera production of documents that would show *377 whether the First Amendment concerns that today's decision can only speculate about actually exist. Two judges-the magistrate and district judge-reviewed those documents. The magistrate concluded, and the district court agreed, that "the emails between Ms. Allmon and staff members of the TCCB have no religious focus, do not discuss church doctrine or governance, and are more or less routine discussions of the burial services at issue here." In reversing the order to produce based on a categorical privilege that doesn't even allow for in camera review, the majority opinion offends the principle of constitutional avoidance it purports to invoke. True avoidance of difficult First Amendment questions would be to not opine on them when they are not properly before the court. See Lebron v. Nat'l R.R. Passenger Corp. , 513 U.S. 374, 408, 115 S.Ct. 961, 130 L.Ed.2d 902 (1995) (O'Connor, J., dissenting) (explaining that principles of appellate waiver "rest[ ] firmly upon a limited view of our judicial power" (citing Carducci v. Regan , 714 F.2d 171, 177 (D.C. Cir. 1983) (Scalia, J.) ) ). That is true for the claim of categorical privilege that has been forfeited if not waived in light of the Texas Catholic Conference of Bishops' submission to the trial court of documents for in camera production that it now argues even a court may not review. The result is an opinion filled with abstract propositions of First Amendment law-some of which I agree with-but that is divorced from the reality of this case. Before declaring that the judges who reviewed the records abused their discretion in concluding they did not pose the claimed harms, the appellate court should look at them.
I.
The rule requiring appellate preservation of error is not the only limit on our authority that the majority opinion overrides. It also engages in an unprecedented act by resolving a discovery dispute at the interlocutory stage. The court recognizes the ordinary rule that discovery disputes are not collateral orders subject to interlocutory appeal, but concludes that gives way when a First Amendment claim is at stake. If actually limited to that type of constitutional claim, our jurisdiction would be a close question. Although we have held that other types of rulings bearing on First Amendment rights are appealable collateral orders, see, e.g., Henry v. Lake Charles Am. Press, LLC , 566 F.3d 164, 180-81 (5th Cir. 2009) (order denying anti-SLAPP dismissal under Louisiana statute); In re Hearst Newspapers, L.L.C. , 641 F.3d 168, 172 (5th Cir. 2011) (order denying journalists access to a sentencing hearing), we have never confronted the tension between that principle and the general rule that discovery orders are not collateral ones, Mohawk Indus. v. Carpenter , 558 U.S. 100, 108, 130 S.Ct. 599, 175 L.Ed.2d 458 (2009). The longstanding rule against such interlocutory review of discovery orders serves important interests: "Routine appeal from disputed discovery orders would disrupt the orderly progress of the litigation, swamp the courts of appeals, and substantially reduce the district court's ability to control the discovery process." 5B CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 3914.23 (2d ed. 1992) ; see also Mohawk , 558 U.S. at 112, 130 S.Ct. 599 ("Permitting parties to undertake successive, piecemeal appeals of all adverse attorney-client rulings would unduly delay the resolution of district court litigation and needlessly burden the Courts of Appeals.")
One circuit confronting the clash between the different rules governing interlocutory review of First Amendment claims and discovery orders concluded that the collateral order doctrine does not allow the immediate appeal of "discovery orders *378 adverse to a claimed First Amendment privilege." In re Motor Fuel Temperature Sales Practices Litig. , 641 F.3d 470, 484 (10th Cir. 2011). Another recognized the difficulty of the question, so avoided it and decided the First Amendment claim in the mandamus context. Perry v. Schwarzenegger , 591 F.3d 1147, 1154-57 (9th Cir. 2010). That is another reason this is such a tough question. The majority opinion assumes that the collateral order doctrine is the only route to stopping a production before it happens. But a mandamus petition, which is just as available to a third party as to a litigant, is the typical way to protect a privilege when its piercing will cause irreparable harm. See In re Itron , 883 F.3d 553, 567-68 (5th Cir. 2018) ; In re Avantel , 343 F.3d 311, 317 (5th Cir. 2003) ("Mandamus is an appropriate means of relief if a district court errs in ordering the discovery of privileged documents, as such an order would not be reviewable on appeal."); see also Mohawk , 558 U.S. at 110, 130 S.Ct. 599 (noting that there are "several potential avenues of review apart from the collateral order appeal", including mandamus, for a "novel privilege ruling"). Tellingly, that is the avenue for appellate relief the Conference originally planned to pursue. At the hearing on the privilege claim, its counsel asked the court "if you rule against us, that you give us time to mandamus the opinion." But prevailing in the mandamus context requires showing a "clear and indisputable" right to relief, Itron , 883 F.3d at 567 (quoting Cheney v. U.S. Dist. Court for D.C. , 542 U.S. 367, 380-81, 124 S.Ct. 2576, 159 L.Ed.2d 459 (2004) ), which is difficult for any claim and especially a novel one.
Even if the reasoning in Henry supports recognizing the collateral order doctrine and not just mandamus as a path for interlocutory review of a First Amendment privilege claim, the problem is that the majority opinion soon becomes disconnected from this narrow jurisdictional hook. It proceeds to discuss whether the discovery request violates a federal statute (the Religious Freedom Restoration Act), and its ultimate ruling is that the district court abused its discretion in balancing the factors under Federal Rule of Civil Procedure 45, the type of judgment call weighing the benefits and burdens of discovery that trial judges make on a daily basis. The majority opinion resorts to the discovery rule under the laudable goal of avoiding constitutional problems. But that doctrine requires a "substantial" constitutional concern. ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 250 (2012); see also United States v. X-Citement Video , Inc. , 513 U.S. 64, 78, 115 S.Ct. 464, 130 L.Ed.2d 372 (1994) (avoiding the constitutional issue because the competing interpretation would "raise serious constitutional doubts"). Much like we should not depart from the most obvious construction of a statute unless that interpretation would likely result in the law being unconstitutional, we should not allow piecemeal review of a discovery order unless that ruling raises a substantial constitutional concern.[1]
II.
A.
The Conference's privilege claim does not present a substantial First Amendment *379 concern for the reason mentioned at the outset: it did not argue in the trial court that the First Amendment barred in camera inspection of its records, so it cannot do so now. And our failure to review the documents means we have no basis for disagreeing with the district court's assessment that they are constitutionally benign.
The Conference provided the documents at the discovery hearing. They are a representative sample it selected of the documents classified as privileged. Counsel for the Conference told the court, "Your Honor, I would like to submit to you the in-camera documents, examples." Neither that statement nor anything else said at the hearing hints at any discomfort with the in camera procedure and certainly no official objection. Counsel even helped facilitate the court's review by breaking down the privileged documents "into three types of internal communication."[2] The failure to object to the in camera inspection certainly forfeits an appellate challenge to it, and the affirmative act of producing the documents likely amounts to full-scale waiver. See Freytag v. C.I.R. , 501 U.S. 868, 895 n.2, 111 S.Ct. 2631, 115 L.Ed.2d 764 (1991) (Scalia, J., concurring) (discussing differences between forfeiture and waiver, the primary one being that the latter requires "intentional relinquishment or abandonment of a known right or privilege").
Even beyond those obstacles to our review, this may be a case of judicial estoppel. Arguing now that the inspection was improper after the Conference willfully provided the documents to the trial court in the hope it would find them privileged has the flavor of the heads-I-win-tails-you-lose positioning that estoppel prohibits. See generally New Hampshire v. Maine , 532 U.S. 742, 749-51, 121 S.Ct. 1808, 149 L.Ed.2d 968 (2001). If the in camera review had resulted in the district court's finding the documents privileged, the Conference would have prevailed. It did not, so the Conference now argues " '[t]he very process of inquiry' into the Bishops' deliberations 'impinge[s] on rights guaranteed by the Religion Clauses.' "
But at a minimum the production resulted in forfeiture, a bedrock limit on appellate review that applies no matter how weighty the interest asserted. Forfeiture, for example, routinely bars the assertion of protections found in the Bill of Rights in the criminal and civil rights cases that dominate our docket. And forfeiture in the context of an objection to in camera privilege review is justified by even more than the interests in restraint, full development of the record, and respect for the trial court that ordinary application of the rule of appellate preservation promotes. It means that any harm resulting from a judge's inspection cannot be undone. With two judges having already reviewed the documents, that cat is out of the bag.[3]
*380 We thus must evaluate the strength of the Conference's privilege claim not based on hypotheticals we can create but in light of the real world documents at issue. And, given that it had no objection to the in camera procedure, the Conference had every incentive to provide the court with examples that presented the best case for privilege. Indeed, plaintiff noted at the hearing that it would not agree that the documents produced were a representative sample because it did not want a court finding of protection for what were likely the best documents for a privilege claim to automatically protect other documents.
B.
The trial court's undisturbed finding that the documents selected by the Conference did not "have [a] religious focus" or "discuss church doctrine or governance" means there is no close constitutional question. I'll start with the Religion Clauses. Free exercise presents an uphill climb given the prevailing, if controversial, view that enforcing neutral laws of general applicability does not offend the Free Exercise Clause. Employment Div., Dep't of Human Res. of Oregon v. Smith , 494 U.S. 872, 879, 885, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990). So even neutral laws that criminalize or otherwise punish a religious practice do not offend free exercise. Id . The district court's application of Federal Rule of Civil Procedure 45, which is the state action here, does not prohibit any religious practice. It seeks documents that the Conference contends discuss religious practices and beliefs. But it cannot be reasonably argued that subjecting the Conference to the same rules of civil procedure that everyone else faces in federal court is aimed at inhibiting the free exercise of religion.
Nor does the order of production amount to court involvement in church leadership decisions, Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C. , 565 U.S. 171, 194-95, 132 S.Ct. 694, 181 L.Ed.2d 650 (2012), or the internal management of a religious organization, Lemon v. Kurtzman, 403 U.S. 602, 607, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971). Whether this line of cases is treated as a burden on the free exercise of religion or as state entanglement with the church under the Establishment Clause,[4] documents that "do not discuss church doctrine or governance" do not come close to the concerns these cases have addressed. What is more, a discovery order is not like the court orders typically involved in this line of cases-such as those requiring a religious organization to engage or not engage in any religious practice, make an employment decision, or alter its educational curriculum.
*381 That leaves the right of association which can fit this context of an order requiring the production of documents. The district court thus correctly viewed this as the Conference's strongest claim. It is not, of course, the type of associational right at issue in the leading case recognizing this aspect of the First Amendment, NAACP v. Alabama ex rel. Patterson , 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958), which involved the disclosure of members of a group to the state with all its power to retaliate against those expressing unpopular views. But courts have also recognized a right to be protected from "other consequences which objectively suggest an impact on, or 'chilling' of, the members' associational rights." Perry v. Schwarzenegger , 591 F.3d 1147, 1160 (9th Cir. 2010). This is where the majority opinion's hypothetical concerns are most plausible. But the district court had the benefit of looking to see if the potential threat to associational activity was realized. It found that it wasn't, and we have no basis for disturbing that finding.
Because the discovery order does not raise a close constitutional question, our jurisdiction does not extend to objections based on federal statutes or rules of procedure. The majority opinion is correct that I "wholly overlook[ ]" the RFRA argument. Faithful application of limits on our ability to hear piecemeal appeals of discovery rules requires that.[5] The majority opinion overlooks that important limitation on our appellate jurisdiction. Its eagerness to address all the issues raised by the Conference and supporting amici also resulted in its neglect of the rule that we do not consider claims that have been forfeited or waived. Adherence to these ordinary limits on our authority was particularly warranted for an expedited appeal that did not allow for oral argument. These rules limiting our authority do not mean that a court will never decide the issue that is not properly preserved. More often they ensure that when a court finally does confront the question, it does so with a full development of the record and law that promotes sound decisionmaking. See Lebron , 513 U.S. at 408, 115 S.Ct. 961 (O'Connor, J., dissenting) (recognizing that "patience in the judicial resolution of conflicts" leads to better decisions (quoting John Paul Stevens, Some Thoughts on Judicial Restraint , 66 JUDICATURE 177, 183 (1982) ) ).
For these reasons, I would affirm the district court.
III.
Two additional observations are in order. The majority opinion ascribes "at least religious insensitivity" if not worse, as well as "intimidation" tactics, to plaintiff's counsel. From this vantage point, it may seem like the stipulation that the plaintiff will not challenge the cost of the burial services as an undue burden means there is no role for the Conference at trial (though the reason trial judges are given considerable discretion in discovery matters is that they know the ins-and-outs of a case having lived with it, sometimes for years). But the plaintiff is not the reason the Conference is involved in this case. Indeed, the stipulation shows plaintiff's willingness to avoid any issues involving the Conference. But the Conference, as is its right, voluntarily appeared at earlier stages of this litigation, and Texas has subpoenaed its witness for trial. What the majority opinion views as an improper threat-that the discovery request will go *382 away if the Conference witness doesn't appear-is just an obvious point that if there is no witness, then there is no need to request documents that might impeach her testimony. More fundamentally, even if this case presents yet another example of the discovery overkill that plagues civil litigation, there is no basis to view the discovery request (the scope of which the plaintiff and Conference worked to greatly narrow) and its timing as anything more than lawyers trying to fulfill their duty of zealous advocacy. The unusual behavior would be if a party did not seek documents from a witness it plans to cross examine at trial.
Even more troubling are the potshots directed at the district court, and the concurring opinion then piles on. That the pecking order of the system allows appellate judges' view of the law to ultimately prevail should be satisfaction enough for us. While vigorous disagreement about the law is part of the judicial function, there is no need to go beyond the identification of legal error by questioning the motives of our district court brethren. That is especially true when the legal issue is one that the majority opinion concedes is novel, and when the ill motives are pure conjecture. What is one of the sins of the trial court according to the majority opinion? Working and issuing orders on a weekend.
Our district court colleagues deserve most of the credit for the federal judiciary being the shining light that it is. They work under greater docket pressures, with greater time constraints, yet with fewer resources. And unlike appellate judges on a divided panel who can trade barbs back and forth, a district judge has no opportunity to respond to personal attacks in an appellate opinion. They deserve our respect and collegiality even when, or especially when, they err as we all do at times. Among the exemplary group of trial judges who serve our circuit, the one handling this case stands out: with over three decades of service, he is now essentially working for free as a senior judge, and volunteering to travel thousands of miles outside the district of his appointment to help with the heavy docket in the Western District of Texas. Speculating that malice is behind his decisions seeking to expedite a high profile case with a rapidly approaching trial date is not the award he is due.

These are two separate "constitutional avoidance" principles. The one that favors reading a statute in a manner (so long as its reasonable) that avoids constitutional difficulties is a canon of construction. The one applied in this case supports first addressing nonconstitutional grounds for a judicial decision. See Scalia & Garner , supra , at 251. But both rules should apply only when the constitutional claim is a difficult one, lest they override other important principles like giving statutes their ordinary meaning or, in this case, not allowing interlocutory review of applications of the federal discovery rules.

Even if there were some suggestion that the Conference was uncomfortable with the in camera review and agreed to it only under compulsion, this appeal shows it knows exactly how to respond when ordered to do something it does not want to do: seek an emergency stay and file an interlocutory appeal.

The forfeiture means we cannot consider the institutional ability of judges to review matters of First Amendment privilege. It is worth noting, however, that judges review privilege in all sorts of sensitive areas that unlike attorney-client privilege are not ones in which lawyers have particular expertise. United States v. Nixon , 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974) (finding that "very important interest in confidentiality of Presidential communications" is not "significantly diminished" by allowing in camera inspection of documents); Elnashar v. Speedway SuperAmerica, LLC , 484 F.3d 1046, 1051 (8th Cir. 2007) (discussing the magistrate's in camera review of unredacted FBI files potentially subject to confidential informant privilege); Stein v. Dep't of Justice & Fed. Bureau of Investigation , 662 F.2d 1245, 1254 (7th Cir. 1981) (basing a conclusion that the FBI may continue to withhold classified national security documents based on in camera review of material). This includes First Amendment claims involving reporters' privilege. United States v. Cuthbertson , 630 F.2d 139, 149 (3d Cir. 1980) (affirming contempt citation for party that failed to produce documents for in camera inspection after asserting journalists' First Amendment privilege). And judges conducting an in camera review do not have to guess in a vacuum at why the documents might be privileged; the party asserting that claim has the opportunity to explain it.

The Conference treats these cases primarily as ones arising under the Establishment Clause. The caselaw is admittedly confusing on which First Amendment clause is the main source of these decisions. A leading scholar argues that the appropriate way to view them is as free exercise cases addressing burdens on church autonomy. See Douglas Laycock, Towards a General Theory of the Religion Clauses: The Case of Church Labor Relations and Right to Chuch Autonomy , 81 Colum. L. Rev. 1373 (1981).

That does not mean there is no outlet for the Conference to raise important statutory concerns. As mentioned, a petition for mandamus relief was a possibility assuming the RFRA issue was preserved.